# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION II

| | |
|---|---|
| PACIFICORP d/b/a PACIFIC POWER & LIGHT COMPANY, | No. 46009-2-II |
| Appellant, | |
| v. | |
| WASHINGTON UTLITIES AND TRANSPORTATION COMMISSION, a Washington State agency, | |
| Respondent, | |
| PUBLIC COUNSEL DIVISION OF THE WASHINGTON ATTORNEY GENERAL'S OFFICE, | |
| Intervenor-Respondent, | PUBLISHED OPINION |
| PACKAGING CORPORATION OF AMERICA f/k/a BOISE WHITE PAPER, L.L.C., | |
| Intervenor-Respondent. | |

LEE, J. — PacifiCorp appeals the Washington Utilities and Transportation Commission's (the Commission) final order (Final Order) in its 2013 general rate case.[1]  PacifiCorp challenges two aspects of the Final Order.  First, PacifiCorp challenges the Commission's refusal to accept PacifiCorp's proposed revisions to its West Control Area interjurisdictional cost allocation methodology.  Second, PacifiCorp challenges the Commission's refusal to accept its proposed

---

[1] Docket UE-130043, Order 05.

revision to PacifiCorp's capital structure used by the Commission in rate-making, specifically the equity component in the debt-to-equity ratio. Because PacifiCorp has not demonstrated that the Commission erred, we affirm.

## FACTS

A.     THE PARTIES

The parties to this appeal are:

(1) Appellants: PacifiCorp, doing business as Pacific Power & Light. PacifiCorp serves retail customers in Washington, Oregon, California, Idaho, Utah, and Wyoming.

(2) Respondents: The Commission.[2] The Commission is the regulatory agency charged by statute with setting public utility rates in this state. RCW 80.01.040; *US W. Commc'ns v. Wash. Utils. & Transp. Comm'n*, 134 Wn.2d 48, 53, 949 P.2d 1321 (1997) *(US W. Commc'ns* I). The Commission has jurisdiction over PacifiCorp's business activities in Washington. *See* RCW 80.01.040.

(3) Intervenor-Respondent: Public Counsel Division of the Washington Attorney General's Office (Public Counsel). Public Counsel is the statutory representative of PacifiCorp's electric customers in Washington.[3]

(4) Intervenor-Respondent: Packaging Corporation of America[4] (Packaging Corp.). Packaging Corp. is PacifiCorp's largest customer in Washington.

---

[2] In the proceedings below, the Commission's staff (the Staff) participates as a party.

[3] RCW 80.01.100.

[4] In the proceedings below, Packaging Corp. participated as Boise White Paper.

B.    BACKGROUND OF PACIFICORP AND THE COMMISSION

In 1987, PacifiCorp merged with Utah Power.  In approving the merger, the Commission expressed concern about the effects on ratepayers of merging PacifiCorp with a higher cost system, but determined that it "was satisfied with the use of [PacifiCorp's] pre-merger average system cost as the basis for" Washington rates.[5]

In 2005, MidAmerican Energy Holdings Company (MEHC) acquired PacifiCorp.[6]  *In re Joint Application of MidAmerican Energy Holdings & PacifiCorp*, Docket UE-051090, Order 07 (Feb. 22, 2006) at ¶¶ 1, 3.  The Commission, MEHC, and PacifiCorp agreed that "MEHC and PacifiCorp will not advocate for a higher cost of capital as compared to what PacifiCorp's cost of capital would have been, using Commission standards, absent MEHC's ownership."  Docket UE-051090, Order 07 (Feb. 22, 2006) (Appendix A at 5).

1.    2006 Rate Case

In PacifiCorp's 2006 general rate case,[7] PacifiCorp proposed the "Revised Protocol," an interjurisdictional cost allocation methodology for use in Washington.  *Wash. Utils. & Transp. Comm'n v. PacifiCorp*, Docket UE 050684, Order 04 (April 17, 2006) at ¶ 26.  "The Revised Protocol is a method or plan for allocating the costs and wholesale revenues associated with PacifiCorp's generation, transmission and distribution system among the six states in PacifiCorp's

---

[5] Utilities operating in Washington must seek approval of mergers and sales from the Commission. RCW 80.12.020.

[6] PacifiCorp continued to operate as a subsidiary of MEHC and retained its name.  MEHC is privately held by Berkshire Hathaway.  Docket UE-051090, Order 07 (Feb. 22, 2006) at ¶ 33.

[7] A general rate case, or general rate proceeding, "is a filing by any regulated company specified in WAC 480-07-500 for an increase in rates," subject to certain limitations.  WAC 480-07-505(1).

jurisdiction for the purpose of setting retail rates." Docket UE 050684, Order 04 at ¶ 27. Under the proposed Revised Protocol, PacifiCorp's six jurisdictions would each bear a share of PacifiCorp's system-wide costs.

The Commission rejected the proposed Revised Protocol, finding that "the resources [PacifiCorp] attempted to assign as costs to Washington were not in fact proven to be used and useful for service in Washington, as required by RCW 80.04.250." AR at 857, *Wash. Utils. & Transp. Comm'n v. PacifiCorp*, Order 05, (Dec. 4, 2013) at ¶ 79; *accord* Docket UE 050684, Order 04 at ¶ 49. The Commission noted that when the Oregon Utilities Commission approved PacifiCorp's merger with Utah Power, it found: "PacifiCorp agrees, however, that its shareholders will assume all risks that may result from less than full system cost recovery if interdivisional allocation methods differ among the merged company's jurisdictions." Docket UE 050684, Order 04 at ¶ 56 (quoting *Pub. Util. Comm'n of Oregon*, Docket UF 4000, Order 88-767 (July 15, 1988)). The Commission found that "[PacifiCorp] admits in the Revised Protocol that it bears the risk of inconsistent allocation methods adopted by the states. In short, any claim of entitlement to a uniform allocation methodology among the states is inconsistent with the 'deal' [PacifiCorp] agreed to in the merger [with Utah Power]." Docket UE 050684, Order 4 at ¶ 56 (footnote omitted).

2.      2007 General Rate Case

In PacifiCorp's 2007 general rate case, PacifiCorp proposed the West Control Area interjurisdictional cost allocation methodology (the "WCA methodology"). The WCA methodology separated PacifiCorp's jurisdictions and included Washington, Oregon, California,

and select other resources located outside of those three states.[8] The WCA methodology isolated the costs associated with the assets, purchases and sales in the WCA jurisdictions, and allocated to Washington a proportionate share of the costs based on Washington's relative contribution to the WCA's demand and energy requirements.

Under the WCA methodology, PacifiCorp sought to recover costs attributable to qualifying facility[9] (QFs) power purchase agreements (PPAs) through customer rates in the state where the QF is physically located. In other words, Washington customer rates include 100 percent of the costs PacifiCorp incurs in buying power from Washington QFs, regardless of whether that cost is higher or lower than market rates, even though power from Washington QFs arguably also serves loads in Oregon and California. But any power attributed to an Oregon or California QF is priced at market rates for Washington customers, not the higher prices from QF production in those states. The Commission adopted the WCA methodology for a five-year trial period.

3.    2011 General Rate Case

In PacifiCorp's 2011 general rate case, PacifiCorp proposed that, for rate-making purposes, the Commission adopt a capital structure with a 52.1 percent equity component and 47.6 percent

---

[8] PacifiCorp's other jurisdictions (Idaho, Utah, and Wyoming) comprise the East Control Area.

[9] "Qualifying facility means a cogeneration facility or a small power production facility" that meets statutory guidelines. 18 C.F.R. § 292.101(b)(1); WAC 480-107-007. Prior to the enactment of Section 210 of the Public Utility Regulatory Policies Act of 1978 (PURPA), qualifying facilities faced a variety of financial and regulatory obstacles. PURPA Section 210(m) Regulations Applicable to Small Power Production and Cogeneration Facilities, Fed. Reg. 64,342, at ¶¶ 19-23. Section 210 sought to alleviate some of these obstacles, and promote the development of QFs in an effort to reduce reliance on fossil fuels. *Cal. Pub. Utils. Comm'n*, 133 FERC ¶ 61,059, at ¶¶ 23-24 (Fed. Energy Regulatory Comm'n Oct. 21, 2010) (Order Granting Clarification and Dismissing Reh'g); 71 Fed. Reg. 64,342, at ¶ 23.

debt component in the debt-to-equity ratio.[10] The Commission found that PacifiCorp's equity component had increased from 46 percent to 52.1 percent over three years as a result of MEHC infusing PacifiCorp with equity. PacifiCorp expected the infusion of equity and growth to continue. The Commission noted that it understood "MEHC's interest in expanding PacifiCorp's equity . . . and reaping the benefit of greater equity returns," but "this interest is inconsistent with the ratepayer interest in a capital structure that reflects economy." *Wash. Utils. & Transp. Comm'n v. PacifiCorp*, Docket UE 100749, Order 06 (Mar. 25, 2011) at ¶ 40. Therefore, the Commission adopted "a hypothetical capital structure for rate-making purposes consisting of 49.1 percent equity" and "50.60 percent long-term debt." Docket UE 100749, Order 06 ¶ 40. In adopting a hypothetical capital structure for rate-making purposes, the Commission "recognize[d] that the decision on the appropriate actual capital structure for PacifiCorp will be made by the parent company, MEHC, and by the ultimate owner, Berkshire Hathaway." Docket UE 100749, Order 06 at ¶ 41.

C.    PACIFICORP'S RATE CASE ON APPEAL

In PacifiCorp's 2013 general rate case, PacifiCorp sought to increase its Washington customer rates by 12.2 percent ($37 million). In relevant part to this appeal, PacifiCorp proposed revisions to the existing WCA methodology and existing hypothetical capital structure used for

---

[10] The debt-to-equity ratio in a capital structure, particularly the amount of equity, materially impacts the price customers pay. Because of the difference between the cost of equity and the cost of debt, a capital structure with relatively more debt and less equity may result in lower cost of capital, and lower customer rates. And, a capital structure with relatively less debt and more equity may result in higher cost of capital, and higher customer rates.

rate-making. Following evidentiary hearings and testimony, the Commission issued the Final Order determining PacifiCorp's rates.

1.      Costs From Out-of-state QFs for Rate-making Purposes

In PacifiCorp's 2013 general rate case, PacifiCorp proposed changes to the WCA methodology. PacifiCorp proposed "that the cost of power from [Oregon and California QF PPAs] should be included" in Washington customer rates.[11]  Transcripts (TR) at 294. PacifiCorp argued that its Oregon and California QF PPA costs should be included in Washington customer rates because those QF PPAs benefitted Washington customers. PacifiCorp also argued that the Oregon's and California's determinations of its costs were reasonable and comparable to QF PPAs in Washington, and that Washington's energy policies are "substantially aligned with Oregon and California." AR at 648-89 (boldface omitted) (some capitalization omitted). Further, PacifiCorp asserted "cost recovery of QF contracts is consistent with PURPA [Public Utility Regulatory Policies Act of 1978]." AR at 651 (boldface omitted) (some capitalization omitted).

---

[11] PacifiCorp's Oregon and California QF PPA costs are determined by Oregon's and California's state regulatory authority. *State ex rel. Utils. Comm'n v. N.C. Power*, 338 N.C. 418, 450 S.E.2d 896, 898 (1994).

> Pursuant to section 210 of the Public Utility Regulatory Policies Act of 1978 (PURPA), regulations of the Federal Energy Regulatory Commission (FERC) promulgated thereunder, and implementation mechanisms of the states, electric utilities are required to purchase power produced by qualifying cogeneration and small power production facilities and are required to pay their "avoided costs" for the power unless another rate is negotiated.

*Id.* at 416. "'Avoided costs' means the incremental costs which the utility would incur if it supplied the power itself or purchased it from another source." *Id.* at 417.

The Staff, Public Counsel, and Packaging Corp. argued that the Commission should not include PacifiCorp's Oregon and California QF PPA costs, as determined by Oregon and California, in its Washington customer rates. David Gomez, on behalf of the Staff, testified that "[t]he recent and substantial expansion of QF power purchases . . . is entirely due to other states' policies designed to rely on the QF requirement of PURPA to considerably increase generation from independent power producers." AR at 3236. Sebastian Coppola, on behalf of Public Counsel, testified that "the proliferation of QFs in Oregon and California is a reflection of those states' energy policies. Washington customers should not pay for decisions made in other states, to serve other states." AR at 3794. Michael Deen, on behalf of Packaging Corp., similarly testified that Washington has implemented its energy policies differently. Gomez and Deen testified that including Oregon's and California's determinations of PacifiCorp's costs would inappropriately increase Washington rates. Coppola noted that "Washington customers should not pay for decisions made in other states, to serve other states." AR at 3794.

2.    Capital Structure for Rate-making Purposes

PacifiCorp also asked the Commission to increase the equity component in its capital structure used for rate-making from 49.1 percent to 52.22 percent. PacifiCorp argued that increasing its equity component for rate-making increases the likelihood that it can earn its allowed rate of return, which would help it maintain its credit rating.

The Commission heard testimony from three expert witnesses regarding PacifiCorp's proposed capital structure: Bruce Williams for PacifiCorp, Kenneth Elgin for the Staff, and

Michael Gorman for Packaging Corp.[12] Williams, on behalf of PacifiCorp, recommended that the Commission increase PacifiCorp's equity level from 49.1 percent to its actual equity level of 52.22 percent. Williams testified that PacifiCorp's high credit ratings are in part due to support from its parent company, MEHC, and "[a]bsent ownership by MEHC and supportive regulatory treatment" PacifiCorp's credit ratings "would have likely suffered a downgrade." AR at 2950-51.

Elgin, on behalf of the Staff, recommended that the Commission decrease the equity component in PacifiCorp's debt-to-equity ratio. Elgin proposed that the Commission decrease PacifiCorp's equity component from 49.1 percent equity to 46 percent equity. Elgin testified that "[w]hen MEHC acquired PacifiCorp, one of the commitments from the new owner was that ratepayers would not be harmed by paying a higher cost of capital as a result of the sale." AR at 3176 (citing *In re Joint Application of MidAmerican Energy Holdings & PacifiCorp*, Docket UE-051090, Order 07). Elgin asserted that, because of MEHC's "decision to capitalize PacifiCorp with excessive equity," PacifiCorp's actual capital structure does not properly balance safety and economy for rate-making purposes. AR at 3176.

Gorman, on behalf of Packaging Corp., recommended that the Commission maintain the 49.1 percent equity component that the Commission had used in PacifiCorp's previous two rate cases. Gorman testified that the hypothetical capital structure the Commission had used allows for returns that will support PacifiCorp's credit ratings. And Gorman testified that PacifiCorp's

---

[12] The expert testimony on this topic "included 487 pages of pre-filed written testimony and attendant exhibits and extensive live testimony." Br. of Resp't (Commission) at 32-33.

proposed capital structure "imposes unnecessarily high costs on Washington ratepayers." AR at 4088. Gorman further testified that during the period where the Commission had used a hypothetical capital structure in determining PacifiCorp's rates, PacifiCorp's credit ratings have been stable and the credit rating agencies report a "[s]table credit outlook." AR at 4087.

3.      The Final Order

In its Final Order, the Commission rejected PacifiCorp's proposed rate increase revisions to the WCA methodology because PacifiCorp "failed to carry its burden to show that revisions" were appropriate. AR at 828. The Commission also rejected PacifiCorp's proposed 52.22 percent equity component in PacifiCorp's debt-to-equity ratio and maintained a hypothetical capital structure with a 49.1 percent equity component for rate-making purposes. PacifiCorp appealed the Final Order to the Thurston County Superior Court and petitioned for direct review by this court under RCW 34.05.518 and RAP 4.1. We accepted direct review.

ANALYSIS

PacifiCorp challenges two aspects of the Commission's underlying rate-making methodology in the Final Order. First, PacifiCorp challenges the Commission's refusal to allow PacifiCorp to recover, through its Washington customer rates, its costs associated with Oregon and California QF PPAs. Specifically, PacifiCorp argues that the Commission's refusal to accept its out-of-state QF PPA costs, as determined by Oregon and California, (1) violates PURPA, (2) is unsupported by the record, and (3) violates the Dormant Commerce Clause. Second, PacifiCorp challenges the Commission's continuing use of a hypothetical capital structure, specifically the equity component in PacifiCorp's debt-to-equity ratio, for rate-making purposes. Specifically, PacifiCorp argues that the Commission erred by (1) using a hypothetical capital structure, (2)

10

No. 46009-2-II

relying on evidence from a past case, and (3) rejecting PacifiCorp's actual capital structure.[13] We disagree.

A.    LEGAL PRINCIPLES

        1.        Review of the Commission's Final Order

        We review the Commission's Final Order under the Administrative Procedure Act (APA), chapter 34.05 RCW.  *US W. Commc'ns* I, 134 Wn.2d at 55.  The party asserting the invalidity of the Commission's action has the burden of demonstrating invalidity.  RCW 34.05.570(1)(a); *US W. Commc'ns* I, 134 Wn.2d at 55.

        RCW 34.05.570(3) provides several grounds for relief from an agency order, including:

        (a) The order . . . is in violation of constitutional provisions on its face or as applied;

        . . . .

        (e) The order is not supported by evidence that is substantial when viewed in light of the whole record before the court . . . .

        . . . .

        (i) The order is arbitrary or capricious.

*US W. Commc'ns, Inc. v. Wash. Utils. & Transp. Comm'n*, 134 Wn.2d 74, 85, 949 P.2d 1337 (1997) (*US W. Commc'ns* II).

---

[13] PacifiCorp's assignments of error are based on the Commission's underlying rate-making methodologies; specifically, the WCA methodology and capital structure used for rate-making. PacifiCorp does not assign error to the Commission's findings of facts, and it does not claim that the Commission's order is arbitrary and capricious.  Rather, PacifiCorp contends that specific portions of the Commission's background discussions lack substantial evidence and are arbitrary. This opinion addresses PacifiCorp's claims as raised in PacifiCorp's briefing.

The Commission's findings are reviewed for substantial evidence supporting the finding. *City of Vancouver v. State Pub. Emp't Relations Comm'n*, 180 Wn. App. 333, 347, 325 P.3d 213 (2014). Substantial evidence is "evidence sufficient to persuade a fair-minded person of their truth." *Id*. The substantial evidence standard is "highly deferential." *ARCO Prods. v. Wash. Utils. & Transp. Comm'n*, 125 Wn.2d 805, 8123, 888 P.2d 728 (1995). Unchallenged findings are verities on appeal. *City of Vancouver*, 180 Wn. App. at 347.

An agency's action is arbitrary and capricious only if it "'is willful and unreasoning and taken without regard to the attending facts or circumstances.'" *Attorney Gen.'s Office v. Wash. Utils. & Transp. Comm'n*, 128 Wn. App. 818, at 824, 116 P.3d 1064 (2005) (quoting *Hillis v. Dep't of Ecology*, 131 Wn.2d 373, 383, 932 P.2d 139 (1997)). "'Where there is room for two opinions, an action taken after due consideration is not arbitrary and capricious even though a reviewing court may believe it to be erroneous.'" *Attorney Gen.'s Office*, 128 Wn. App. at 824 (quoting *Rios v. Dep't of Labor & Indus.*, 145 Wn.2d 483, 501, 39 P.3d 961 (2002)). "Neither the existence of contradictory evidence nor the possibility of deriving conflicting conclusions from the evidence renders an agency decision arbitrary and capricious." *Attorney Gen.'s Office*, 128 Wn. App. at 824.

2.     The Commission's Authority

The Commission is directed to "[r]egulate in the public interest . . . the rates, services, facilities, and practices of all persons . . . supplying any utility service . . . ." RCW 80.01.040(3); *US W. Commc'ns* I, 134 Wn.2d at 53. The function of rate-making is legislative in character, and the judicial branch is not empowered to undertake the job of fixing rates. *US W. Commc'ns* I, 134 Wn.2d at 53-54. The burden of proof for increased rates is on the utility. RCW 80.04.130(4).

The Commission must set "just, fair, reasonable and sufficient" rates. RCW 80.28.010. "A utility is not permitted to recover every expense in its rate structure; the WUTC 'has the power to review operating expenses incurred by a utility and to disallow those which were not prudently incurred.'" *Willman v. Wash. Utils. & Transp. Comm'n*, 122 Wn. App. 194, 204, 93 P.3d 909 (2004) (quoting *People's Org. for Wash. Energy Res. v. Utils. & Transp. Comm'n (POWER)*, 104 Wn.2d 798, 810, 711 P.2d 319 (1985)), *aff'd,* 154 Wn. 2d 801, 117 P.3d 343 (2005). But the Commission must "'assure that regulated utilities earn enough to remain in business.'" *Willman*, 122 Wn. App. at 204 (quoting *POWER*, 104 Wn.2d at 808). "The statutory requirement that rates be 'just and reasonable' is obviously incapable of precise judicial definition, and we afford great deference to the Commission in its rate decisions."[14] *Morgan Stanley Capital Grp. Inc. v. Pub. Util. Dist. No. 1*, 554 U.S. 527, 532, 128 S. Ct. 2733, 171 L. Ed. 2d 607 (2008). Moreover, "[t]he economic judgments required in rate proceedings are often hopelessly complex and do not admit of a single correct result." *Duquesne Light Co. v. Barasch*, 488 U.S. 299, 313, 109 S. Ct. 609, 102 L. Ed. 2d 646 (1989).

"The Commission has broad generalized powers in rate-setting matters." *US W. Commc'ns I*, 134 Wn.2d at 56. "[C]ourts are not at liberty to substitute their judgment for that of the Commission in rate cases and that within a fairly broad range, regulatory agencies exercise

---

[14] In discussing whether "an otherwise reasonable rate [was] subject to constitutional attack by questioning the theoretical consistency" of the underlying methodology, the United States Supreme Court held, "'[I]t is not theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unreasonable, judicial inquiry . . . is at an end. The fact that the method employed to reach that result may contain infirmities is not then important." *Duquesne Light Co. v. Barasch*, 488 U.S. 299, 310, 109 S. Ct. 609, 102 L. Ed. 2d 646 (1989) (alteration in original) (quoting *Fed. Power Comm'n v. Hope Nat. Gas Co.*, 320 U.S. 591, 602, 64 S. Ct. 281, 88 L. Ed. 333 (1944)).

substantial discretion in selecting the appropriate rate-making methodology." *US W. Commc'ns I*, 134 Wn.2d at 56.

"We give substantial deference to a regulatory agency's judgment about how best to serve the public interest." *Attorney Gen.'s Office*, 128 Wn. App. at 824. An agency's decision cannot be set aside absent a clear showing of abuse of discretion. *Attorney Gen.'s Office*, 128 Wn. App. at 825; *accord Arco Prods. v. Utils. & Transp. Comm'n*, 125 Wn.2d 805, 812, 888 P.2d 728 (1995). We do not weigh evidence or judge witness credibility. *City of Vancouver*, 180 Wn. App. at 347. Similarly, the Commission is afforded broad discretion in weighing the testimony of experts. *See US W. Commc'ns* I, 134 Wn.2d at 62.

Thus, the Commission's findings are prima facie correct. RCW 80.04.430. "This is especially true where, as here, the issues involve complex factual determinations peculiarly within the expertise of the commission." *Cole v. Wash. Utils. & Transp. Comm'n*, 79 Wn.2d 302, 309, 485 P.2d 71 (1971).

B.      RECOVERY OF OUT-OF-STATE QF PPA COSTS

        1.  PURPA Challenge

PacifiCorp argues that the Commission violated PURPA by (a) disallowing "cost recovery of PacifiCorp's out-of-state QF PPAs when it was undisputed that they were priced at PacifiCorp's avoided costs"; (b) re-pricing the out-of-state QF PPAs in Washington at market rates; and (c) ignoring PURPA's specific cost recovery mandate.[15] Br. of Appellant at 22. We disagree.

---

[15] PacifiCorp also argues that the Commission's "refusal to allow cost recovery for PacifiCorp's out-of-state QF PPAs is arbitrary and capricious and inconsistent with the Commission's treatment of other regional QF PPAs." Br. of Appellant at 31. PacifiCorp references the Commission's treatment of Avista Utilities, but offers no substantive argument about how the Commission's

Whether the Commission violated PURPA is a question of law, which this court reviews de novo. *See Office of the Governor v. Pub. Emp't Relations Comm'n*, 183 Wn. App. 758, 763-64, 334 P.3d 1177 (2014).

PURPA was enacted in an effort to "reduce the country's dependence on imported fuels by encouraging the addition of cogeneration and small power production facilities to the nation's electrical generating system." *Pub. Serv. Co. of Oklahoma of Oklahoma v. State ex rel. Oklahoma Corp. Comm'n*, 115 P.3d 861, 870 (Okla. 2005). In relevant part, PURPA provides rate and purchase guidelines for utilities and small producers. New PURPA Section 210(m) Regulations Applicable to Small Power Production and Cogeneration Facilities, 71 Fed. Reg. 64,342 (Nov. 1, 2006).

Utilities are required to offer for purchase energy from QFs at rates that are "just and reasonable to the ratepayers of the utility" and do not exceed the utility's avoided costs. New PURPA Section 210(m) Regulations, 71 Fed. Reg. 64,342, at ¶ 23. Avoided costs are the incremental costs the utility would incur if it supplied the power itself or purchased it from another source. *State ex rel. Utils. Comm'n v. North Carolina Power*, 338 N.C. 412, 417, 450 S.E.2d 896 (1994).

---

decision was arbitrary or capricious, or inconsistent with its treatment of Avista Utilities. It notes that PacifiCorp's expert testified that Avista's rates include QF PPAs located in Idaho, but it provides no further information about those parties' agreed upon cost allocation methodology. We decline to address arguments unsupported by citation to authority or argument. RAP 10.3(a)(6); *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992). Accordingly, we do not address PacifiCorp's argument regarding the treatment of Avista Utilities.

Congress tasked the Federal Energy Regulatory Commission (FERC) with implementing PURPA, and each state regulatory authority is required to implement FERC's rules.[16] *Fed. Energy Regulatory Comm'n v. Mississippi*, 456 U.S. 742, 751, 102 S. Ct. 2126, 72 L. Ed. 2d 532 (1982) (citing PURPA § 210(f), codified at 16 U.S.C. § 824a-3(f)). FERC's regulations "provide state commissions with guidelines" to implement rate provisions and determine a utility's avoided costs. *Cal. Pub. Utils. Comm'n*, 133 FERC ¶ 61,059, at ¶¶ 23-24 (Fed. Energy Regulatory Comm'n Oct. 21, 2010) (Order Granting Clarification and Dismissing Reh'g); New PURPA Section 210(m) Regulations, 71 Fed. Reg. 64,342 at ¶ 23.

In 2005, Congress enacted the Energy Policy Act, which added § 210(m) to PURPA.[17] New PURPA Section 210(m) Regulations, 71 Fed. Reg. 64,342, at ¶ 1. Section 210(m)(7), codified at 16 U.S.C. § 824a-3(m)(7), provides that "[t]he Commission shall issue and enforce such regulations as are necessary to ensure that an electric utility that purchases electric energy or capacity from a [qualifying facility] . . . under this section recovers all prudently incurred costs associated with the purchase." New PURPA Section 210(m) Regulations, 71 Fed. Reg. 64,342, at

---

[16] FERC has exclusive jurisdiction over rates for interstate wholesale energy sales. *New York v. FERC*, 535 U.S. 1, 18-20, 122 S. Ct. 1012, 152 L. Ed. 2d 47 (2002). And, "[o]nce FERC sets such a rate, a State may not conclude in setting retail rates that the FERC-approved wholesale rates are unreasonable." *Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953, 966, 106 S. Ct. 2349, 90 L. Ed. 2d 943 (1986). Rather, a State must give effect to Congress' desire to give FERC plenary authority over interstate wholesale rates and States must not interfere with this authority. *Nantahala Power*, 476 U.S. at 966. FERC did not set PacifiCorp's QF PPA rates in Oregon or California.

[17] Section 210(m) is titled "Termination of Mandatory Purchase and Sale Requirements." "The section revises the rights and obligations between electric utilities and QFs." New PURPA Section 210(m) Regulations, 71 Fed. Reg. 64,342, at ¶ 25.

¶ 25. Pursuant to Section 210(m), FERC issued new regulations. *See* New PURPA Section 210(m) Regulations, 71 Fed. Reg. 64,342.

During the proposed rulemaking, the utilities argued that FERC should adopt new regulations to implement § 210(m)(7) to "permit consistent, complete and timely recovery of the utility's prudently-incurred QF purchase costs," because "the states and the Commission often use different methodologies for allocating costs between the jurisdictions." New PURPA Section 210(m) Regulations, 71 Fed. Reg. 64,342, at ¶ 215. Despite the utilities' arguments, FERC stated that it was "reluctant to review an issue that should be handled by the states in the first instance." New PURPA § 210(m) Regulations, 71 Fed. Reg. 64,342, at ¶ 216. FERC's final rule stated: "The Final Rule does not adopt new regulations implementing section 210(m)(7), regarding an electric utility's recovery of prudently incurred costs relating to purchases of electricity from QFs."[18] New PURPA Section 210(m) Regulations, 71 Fed. Reg. 64,342, at ¶ 18.

a.      Cost recovery of Oregon and California's QF PPAs

PacifiCorp argues that the Commission violated PURPA by disallowing "cost recovery of PacifiCorp's out-of-state QF PPAs when it was undisputed that they were priced at PacifiCorp's avoided costs." Br. of Appellant at 22. We disagree because PURPA does not require that PacifiCorp be entitled to recover its Oregon and California QF PPA costs through its Washington customer rates, even where Oregon and California did not price those QF PPAs at rates that exceeded Oregon and California's determinations of PacifiCorp's avoided costs.

---

[18] Washington has not implemented regulations that mandate recovery of a utility's QF PPA costs through customer rates.

In approving a utility's QF PPA, the state regulatory authority determines a utility's avoided costs. New PURPA Section 210(m) Regulations, 71 Fed. Reg. 64,342, at ¶ 23; *Cal. Pub. Utils. Comm'n*, 133 FERC ¶ 61,059, at ¶ 24. A state regulatory authority cannot require a utility to purchase energy from a QF at rates in excess of the utility's avoided costs, as determined by that state regulatory authority. New PURPA Section 210(m), 71 Fed. Reg. 64,342, at ¶ 23; *Cal. Pub. Utils. Comm'n*, 133 FERC ¶ 61,059, at ¶ 24. PacifiCorp's QF PPAs in Oregon and California are based on Oregon's and California's determination of PacifiCorp's avoided costs in their respective jurisdictions. *See Cal. Pub. Utils. Comm'n*, 133 FERC ¶ 61,059, at ¶ 24.

PacifiCorp claims that the Commission is required to accept Oregon's and California's determination of PacifiCorp's avoided costs. PacifiCorp frames the relevant inquiry as whether its Oregon and California QF PPAs are priced consistently with Oregon's and California's avoided cost determinations. [19] However, the relevant inquiry is whether the Commission is required to adopt Oregon's and California's determination of PacifiCorp's avoided costs and include those avoided costs in PacifiCorp's Washington customer rates.

PacifiCorp relies on *North Carolina Power*, 338 N.C. 412, to assert that because "[t]he Commission did not find that the out-of-state QF PPA prices exceeded PacifiCorp's avoided costs," the Commission was required to accept Oregon's and California's avoided cost

---

[19] PacifiCorp repeatedly argues that it is entitled to recover the costs attributable to Oregon and California QF PPAs because it presented unrebutted evidence that the costs it seeks to recover in Washington are consistent with the costs determined by Oregon's and California's regulatory authorities for recovery in their respective states. PacifiCorp's argument requires this court to assume that the Commission must accept Oregon's and California's determination of PacifiCorp's avoided costs in setting Washington customer rates. Practically speaking, PacifiCorp's position would strip the Commission of its authority to set rates if it were required to set a utility's customer rates based on the utility's avoided costs as determined by other jurisdictions.

determination. Br. of Appellant at 23. But *North Carolina Power* does not support that contention. Rather, *North Carolina Power* held that PURPA does not require a state regulatory authority to accept another state's avoided cost determination for rate-making purposes. 338 N.C. at 421.

In *North Carolina Power*, the utility sought to increase its North Carolina customer rates to recover its costs attributable to a QF PPA in Virginia. 338 N.C. at 418. The Virginia QF PPA costs were determined by the Virginia State Corporation Commission and were based on Virginia's determination of North Carolina Power's avoided costs. *N.C. Power*, 338 N.C. at 418. The North Carolina Utilities Commission rejected Virginia's avoided cost determination and did not allow the utility to pass on the Virginia QF PPA costs on to its North Carolina customers. *Id.* at 421.

On appeal, the utility argued that the North Carolina Utility Commission's refusal to allow full cost recovery violated PURPA. *Id.* at 417. The North Carolina Supreme Court affirmed the Utility Commission, holding that under PURPA and North Carolina state law, the North Carolina Utilities Commission was not required to accept Virginia's avoided cost determinations and to include those costs in North Carolina customer rates. *Id.* at 421.

PacifiCorp's authority does not support its assertion that PURPA requires a state utility commission to accept another state utility commission's determination of a utility's avoided costs. Accordingly, PacifiCorp's claim that the Commission violated PURPA by disallowing recovery of PacifiCorp's avoided costs as determined by Oregon and California fails.

    b.      Re-pricing of QF PPAs

PacifiCorp claims that the Commission "re-priced" PacifiCorp's Oregon and California QF PPAs. Br. of Appellant at 25. PacifiCorp does not provide factual support, meaningful

argument, or relevant authority to support its claim that the Commission violated PURPA by "re-pricing" PacifiCorp's out-of-state QF PPAs at market rates.[20]  Because PacifiCorp fails to provide authority for its argument, PacifiCorp's "re-priced" argument fails.

   c.  Cost recovery mandate

PacifiCorp argues that the Commission violated PURPA's "cost recovery mandate," and that "attempts by state regulatory commissions to deny full cost recovery are preempted by PURPA."  Br. of Appellant at 25.  We disagree because PacifiCorp has not demonstrated that PURPA has a cost recovery mandate requiring one state to adopt another state's avoided costs determination.

PacifiCorp relies on 16 U.S.C. § 824a-3(m)(7)(A) in support of its assertion.  PacifiCorp's reliance is misplaced.

16 U.S.C. § 824a-3(m)(7)(A) provides that "[FERC] shall issue and enforce such regulations as are necessary to ensure that [a utility] . . . recovers all prudently incurred costs associated with the purchase."  To the extent that 16 U.S.C. § 824a-3(m)(7) is a mandate, the plain language of that section mandates FERC to consider regulations regarding a utility's cost recovery.

---

[20] PacifiCorp cites to authority governing utility energy purchase requirements from QFs and a utility's ability to modify its QF PPAs.  But the issue is whether the Commission is obligated to allow PacifiCorp to recover all of its costs related to its Oregon and California QF PPAs, as determined by Oregon and California, through Washington customer rates.  Thus, PacifiCorp's cited authority are not applicable.

  To the extent PacifiCorp argues that regulations governing utility energy purchase requirements are applicable here, PacifiCorp fails to provide authority for the proposition that the rules governing the utility's purchase of energy from QFs also govern a state utility commission's decision in setting customer rates.  "Where no authorities are cited in support of a proposition, the court is not required to search out authorities, but may assume that counsel, after diligent search, has found none."  *DeHeer v. Seattle Post-Intelligencer*, 60 Wn.2d 122, 126, 372 P.2d 193 (1962).

FERC considered but expressly declined to adopt a rule implementing the language in 16 U.S.C. § 824a-3(m)(7), in part because it found that the recovery of costs was a matter of state discretion. New PURPA Section 210(m), 71 Fed. Reg. 64,342, ¶¶ 18, 214-16. Accordingly, PacifiCorp's reliance on 16 U.S.C. § 824a-3(m)(7)(A) fails.

PacifiCorp also cites *Freehold Cogeneration Associates, L.P. v. Board of Regulatory Commissioners*, 44 F.3d 1178, 1194 (3d Cir. 1995), to support its assertion that it is entitled to full cost recovery. However, PacifiCorp does not provide argument about how *Freehold* applies here. Moreover, *Freehold* is distinguishable from the issue in the present case. *Freehold* held that:

> [O]nce the [state utility commission] approved the power purchase agreement between [the QF] and [the utility] on the ground that the rates were consistent with avoided cost, any action or order by the [state utility commission] to reconsider its approval or to deny the passage of those rates to [the utility's] consumers under purported state authority was preempted by federal law.

*Freehold*, 44 F.3d at 1194. *Freehold* is inapplicable because the Commission did not determine PacifiCorp's avoided costs or approve the Oregon and California QF PPAs. Rather, Oregon and California determined PacifiCorp's avoided costs relating to the QF PPAs in their respective states. *See Cal. Pub. Utils. Comm'n*, 133 FERC ¶ 61,059, at ¶¶ 23-24. Therefore, because the Commission did not approve PacifiCorp's Oregon and California QF PPAs, *Freehold* does not support PacifiCorp's argument.

The crux of PacifiCorp's argument is that PURPA requires the Commission to accept Oregon's and California's avoided cost determination for rate-making in Washington. But PacifiCorp has not provided any authority that PURPA requires a state utility commission to accept

another state's avoided cost determinations for purposes of setting customer rates. Therefore, PacifiCorp's argument that the Commission violated PURPA's "cost recovery mandate" fails.[21]

2.    Substantial Evidence Supports the Final Order

PacifiCorp argues that the Commission's "disallowance of out-of-state QF PPAs lacks substantial evidence in the record."[22] Br. of Appellant at 26 (boldface omitted). We disagree.

PacifiCorp does not assign error to the Commission's findings of fact. Unchallenged findings of fact are verities on appeal. *City of Vancouver*, 180 Wn. App. at 347. Therefore, the Commission's findings are verities on appeal.

PacifiCorp challenges paragraphs 111, 113, and 100 in the Final Order. These paragraphs are presented as factual background in the Final Order, not as findings or conclusions. As a threshold matter, PacifiCorp does not explain how, even if paragraphs 111, 113, and 100 are unsupported by substantial evidence, PacifiCorp's challenge would require us to reverse the Final Order. And even if the factual background paragraphs to which PacifiCorp assigns error could, in part, be interpreted as findings of fact, PacifiCorp's challenge fails.

---

[21] PacifiCorp also asserts that the "aspects" of the Commission's Final Order refusing to allow PacifiCorp to recover Oregon's and California's avoided cost determinations are preempted under the Supremacy Clause of the United States Constitution. Br. of Appellant at 26. To the extent PacifiCorp is arguing that the Commission's Final Order violated PURPA and is therefore preempted by the Supremacy Clause, that argument fails because PacifiCorp has not demonstrated that the Commission's Final Order violated PURPA.

[22] Although PacifiCorp asserts that the Commission's disallowance of out-of-state QF PPAs is unsupported by substantial evidence, its argument focuses on justifying the validity of its proposed revisions to the WCA interjurisdictional cost allocation methodology. The Commission has "substantial discretion in selecting the appropriate rate-making methodology"; we do not reverse the Commission's decision absent an abuse of discretion. *US W. Commc'ns* I, 134 Wn.2d at 56-57; *Arco Prods.*, 125 Wn.2d at 812.

a.      Final Order, Paragraph 111

PacifiCorp argues that substantial evidence does not support the Commission's finding in

paragraph 111. We disagree.

Paragraph 111 states:

Furthermore, situs allocation is fair. Like Oregon and California, Washington has adopted policies favoring and encouraging renewable energy. However, the approaches of the three states are different. Oregon and California have implemented PURPA to carry out policies favoring renewable energy that has resulted in 74 percent of PacifiCorp's QF power for 2014 coming from contracts PacifiCorp entered in the last 5 years at avoided cost rates for Oregon and California. Washington policy makers have relied less on PURPA and more on renewable portfolio standards and greater use of tax-related incentives to promote renewable energy development in this state. Washington's policies are paid for by Washington taxpayers or ratepayers, as this state's policy makers determine. Absent a regionally negotiated alternative arrangement, Oregon's and California's renewable energy policies should be paid for by the taxpayers and ratepayers of those states, as determined by their policy makers.

AR at 872, Order 05, at ¶ 111 (footnote omitted). PacifiCorp contends that "[t]here is no evidence

to support the Commission's position that Oregon and California are promoting a different energy

policy agenda than Washington through renewable QF PPA development." Br. of Appellant at

27.

PacifiCorp essentially argues that the Commission is required to include PacifiCorp's costs

as determined by Oregon and California because of similarities between Washington's, Oregon's,

and California's energy policies. PacifiCorp's argument focuses on similarities in policies, but

does not address the distinction between different methods of promoting similar policy objectives

and different policy objectives. Moreover, whether the energy policies of the three states are

sufficiently similar to justify adopting a new interjurisdictional cost allocation methodology is an

issue of energy policy—not an issue of substantial evidence.[23] Even assuming without deciding that Washington, Oregon, and California have similar energy policies and similar methods of implementing those policies, PacifiCorp has not offered any authority that the Commission is required to adopt Oregon's and California's determination of PacifiCorp's avoided costs when the utility incurs costs that are determined by different but "similar" states.[24] In the absence of any authority that the Commission is required to adopt Oregon's and California's determination of PacifiCorp's avoided cost in their respective states based on the fact that the three states have similar energy policies, PacifiCorp's argument fails.

To the extent that PacifiCorp's argument is based on the fact that the record contains some evidence that contradicts the Commission's determination, PacifiCorp's argument fails. The mere presence of contradictory evidence in the record does not render the Commission's determination unsupported by substantial evidence. *See Schatz v. Dep't of Soc. & Health Servs.*, 178 Wn. App. 16, 25, 314 P.3d 406 (2013), *review denied*, 180 Wn.2d 1013 (2014) ("As long as substantial evidence supports a finding, it does not matter that other evidence may contradict it.").

Moreover, to the extent that paragraph 111 is construed as a finding of fact, it is supported by substantial evidence in the record. David Gomez, on behalf of the Staff, testified that "[t]he recent and substantial expansion of QF power purchases . . . is entirely due to other states' policies

---

[23] To the extent PacifiCorp is asking this court to dictate energy policy and replace the Commission's judgment with our own, that argument fails because energy policy is a discretionary function of the Commission. *See US W. Commc'ns II*, 134 Wn.2d at 99 (questions of policy are within the discretion of the Commission).

[24] PacifiCorp acknowledges that Washington would determine its avoided costs differently than Oregon and California.

designed to rely on the QF requirement of PURPA to considerably increase generation from independent power producers." AR at 3236. Sebastian Coppola, on behalf of Public Counsel, testified that "the proliferation of QFs in Oregon and California is a reflection of those states' energy policies. Washington customers should not pay for decisions made in other states, to serve other states." AR at 3794. Michael Deen, on behalf of Packaging Corp., noted as one example that, unlike Oregon and Idaho, Washington does not implement fixed price standards for QFs. Thus, substantial evidence supports the Commission's "finding" that situs allocation is fair, leading to each state's ratepayers bearing the burden for their own state's policies.

### b.      Final Order, Paragraph 113

PacifiCorp argues that paragraph 113 is not supported by the substantial evidence; rather, the evidence "shows that PacifiCorp's out-of-state QF PPA costs are comparable to . . . other Washington QF PPAs." Br. of Appellant at 28. We disagree.

Paragraph 113 states:

Staff's analyses show that there is a significant financial impact on Washington state ratepayers due to the different QF policies in Oregon and Washington. The Oregon and California QF contracts result in net power costs that are significantly higher than would be the case if they were priced at Washington avoided cost rates. Again, as argued by Staff, absent a regionally negotiated alternative arrangement, each state should bear the costs of its respective renewable energy policies.

AR at 872 (footnote omitted).

PacifiCorp asserts that the "if all of PacifiCorp's out-of-state QF PPAs had been re-priced under Washington's avoided cost methodology," it would result in "a small differential in avoided costs" of "only $2.6 million." Br. of Appellant at 29. There is no authority addressing whether a cost differential of $2.6 million is significant or insignificant. The significance of the resulting

cost differential is a policy consideration for the Commission to determine. *See US W. Commc'ns II*, 134 Wn.2d at 99 (questions of policy are within the discretion of the Commission). Without authority, we decline PacifiCorp's invitation to dictate energy policy to the Commission.

Moreover, to the extent that paragraph 113 is construed as a finding of fact, it is supported by substantial evidence. Gregory Duvall, for PacifiCorp, and Gomez, for the Staff, testified that including Oregon's and California's QF PPAs would increase power costs by roughly $10 million. Further, Michael Deen, for Packaging Corp., testified that accepting PacifiCorp's proposed changes would "inappropriately assign more system costs to Washington customers." AR at 3975 (also noting that situs allocation protected Washington customers from other state's pricing policies). Thus, PacifiCorp's challenge against paragraph 113 fails.

### c. Final Order, Paragraph 100

PacifiCorp also assigns error to paragraph 100. Paragraph 100 states:

In this case, even though PacifiCorp recognizes the need to show "'tangible and quantifiable benefits to Washington[] before the resources can be included in rates" [PacifiCorp] simply makes the vague assertion that the Oregon and California QFs provide "undifferentiated generation to serve Washington load and [enable] PacifiCorp to avoid generation costs that would otherwise be incurred in the absence of these resources." [PacifiCorp] adds that:

> Other benefits of renewable QF contracts include system diversity, increased transmission reliability, reduced environmental impact, and promotion of Washington's energy policies to mitigate greenhouse gas emissions and climate change.

Concerning PacifiCorp's focus on "undifferentiated generation to serve Washington load," however, Mr. Gomez testified during his cross-examination that the relationship between situs allocation and Washington load is not a material consideration. Situs allocation is about "the assignment of costs" and "doesn't speak to what the actual flow of power is."

AR 866-67, Order 05 at ¶ 100.

PacifiCorp appears to take issue with the Commission's characterization of PacifiCorp's argument that the out-of-state QF PPAs provide benefit to Washington as a "vague assertion." Br. of Appellant at 30. PacifiCorp argues that out-of-state QF PPAs directly benefit Washington customers, yet does not cite to evidence in the record demonstrating that benefit. Instead, the evidence shows that PacifiCorp had not prepared power flow studies for the Washington service areas and did not provide the quantitative evidence necessary for the Commission to accept PacifiCorp's proposed QF contract allocation.

PacifiCorp also argues that "the Commission's justifications for rejecting recovery of out-of-state QF PPAs are neither supported nor compelling." Br. of Appellant at 31. To the extent PacifiCorp suggests that the Commission has the burden, it is incorrect. Before the Commission, PacifiCorp had the burden to justify its rate proposal. *US W. Commc'ns* II, 134 Wn.2d at 84 (noting that the utility has the burden to justify increasing its rates). And before this court, PacifiCorp has the burden to demonstrate that the Commission erred or the Final Order is invalid. RCW 34.05.570. PacifiCorp has done neither. Therefore, PacifiCorp's substantial evidence challenge fails.

3.    The Dormant Commerce Clause

PacifiCorp claims that the Final Order violates the dormant Commerce Clause[25] because it is discriminatory on its face. We disagree.

---

[25] U.S. CONST., art. I, § 8, cl. 3.

a. Legal principles

Constitutional challenges are questions of law that this court reviews de novo. *City of Redmond v. Moore*, 151 Wn.2d 664, 668, 91 P.3d 875 (2004); *Attorney Gen.'s Office*, 128 Wn. App. at 827. PacifiCorp bears the burden of establishing that the Final Order violates the dormant Commerce Clause because it discriminates against out-of-state economic interests. *Int'l Franchise Ass'n v. City of Seattle*, 803 F.3d 389, 401 (9th Cir. 2015); *see New York State Rifle & Pistol Ass'n v. City of New York*, 86 F. Supp. 3d 249, 266 (S.D.N.Y. 2015).

The Commerce Clause provides Congress the authority to regulate interstate commerce. *Rocky Mountain Farmers Union v. Corey*, 730 F.3d 1070, 1087 (9th Cir. 2013), *cert. denied,* 134 S. Ct. 2875 (2014). The dormant Commerce Clause is the negative implication of the Commerce Clause and prohibits states from enacting laws that discriminate against or unduly burden interstate commerce. *North Dakota v. Heydinger*, 15 F. Supp. 3d 891, 910 (2014) (citing *South Dakota Farm Bureau, Inc. v. Hazeltine*, 340 F.3d 583, 592 (8th Cir. 2003), *cert. denied*, 541 U.S. 1037 (2004)). For dormant Commerce Clause purposes, discrimination simply means treating in-state and out-of-state economic interests differently by benefitting the former and burdening the latter. *Rocky Mountain Farmers*, 730 F.3d at 1087.

Facial discrimination is recognized where a regulation distinguishes between in-state and out-of-state products without showing a nondiscriminatory reason for the distinction. *Rocky Mountain Farmers*, 730 F.3d at 1089. "But a regulation is not facially discriminatory simply because it affects in-state and out-of-state interests unequally. . . . [T]here must be 'some reason,

apart from their origin, to treat [the interests] differently.'" *Id.* (quoting *Philadelphia v. New Jersey*, 437 U.S. 617, 627, 98 S. Ct. 2531, 57 L. Ed. 2d 475 (1978)).

b.      Comparison of economic interests

In order to determine whether the Final Order is discriminatory, we must first determine which entities are suitable for comparison. *See Rocky Mountain Farmers*, 730 F.3d at 1088. "Entities are similarly situated for constitutional purposes if their products compete against each other in a single market." *Id.* at 1088.

PacifiCorp asserts that the affected in-state and out-of-state economic interests are PacifiCorp's in-state and out-of-state QF PPAs. This assertion fails.

While the QF PPAs involve commerce, the Final Order does not affect PacifiCorp's in-state or out-of-state QF PPAs. The only evident economic interest at issue here is PacifiCorp's economic interest. However, even assuming without deciding that the Final Order affected PacifiCorp's in-state and out-of-state QF PPAs, PacifiCorp fails to show that the in-state and out-of-state QFs are suitable for comparison. As noted, determining whether the order is discriminatory requires evaluating in-state and out-of-state interests that "compete against each other in a single market." *Id.* at 1088. PacifiCorp does not argue or establish that its in-state and out-of-state QFs compete in a single market. Thus, PacifiCorp fails to identify competing in-state and out-of-state economic interests suitable for comparison.

c.      Interstate commerce not implicated

Also, PacifiCorp provides no authority to support its argument that the Commission's treatment of PacifiCorp's various costs in setting Washington customer rates implicates the dormant Commerce Clause. PacifiCorp relies on cases where the regulatory authority regulated

the movement of commerce, which affected in-state and out-of-state economic interests. However, those cases are distinguishable.

PacifiCorp cites to *New England Power Co. v. New Hampshire*, 455 U.S. 331, 102 S. Ct. 1096, 71 L. Ed. 2d 188 (1982). There, the Court held that New Hampshire had "sought to restrict the flow of privately owned and produced electricity in interstate commerce" and required New England Power to sell electricity to New Hampshire utilities in an amount equal to the output of its facility. *Id*. at 344, 336. But here, the Final Order does not direct the purchase or sale of energy, or affect the flow of energy to and from the State. Instead, the Commission sets PacifiCorp's customer rates, which includes a determination about the appropriate allocation of PacifiCorp's costs, which are in part, based on PacifiCorp's purchase of energy.

PacifiCorp also cites to *Middle South Energy, Inc. v. Arkansas Public Service Commission*, 772 F.2d 404 (8th Cir. 1985). In *Middle South Energy*, the court found that the Arkansas Public Service Commission violated the Commerce Clause where it prohibited an Arkansas utility from purchasing out-of-state energy. 772 F.2d at 417. Here, however, the Final Order does not prohibit, or attempt to dictate, where PacifiCorp purchases its energy. Thus, *Middle South Energy* is inapplicable.

Finally, PacifiCorp relies on *Illinois Commerce Commission v. Federal Energy Regulatory Commission*, 721 F.3d 764 (7th Cir. 2013), *cert. denied*, 134 S. Ct. 1278 (2014). PacifiCorp asserts that the *Illinois Commerce Commission*, "observed in dicta that states cannot 'discriminate against out-of-state renewable energy' by requiring a utility to use only in-state renewable energy to comply with a renewable portfolio standard." Br. of Appellant at 35-36 (quoting *Illinois Commerce Comm'n*, 721 F.3d at 776). While PacifiCorp accurately recites *Illinois Commerce*

*Commission*'s comments, there is no indication that the Commission required PacifiCorp to use in-state energy, or prohibited PacifiCorp from using out-of-state energy. Accordingly, *Illinois Commerce Commission* is also inapplicable.

This case is similar to *North Carolina Power*, 338 N.C. 412. In *North Carolina Power*, the utility argued that North Carolina Utility Commission's disallowance of North Carolina Power's avoided costs as determined by Virginia's utility commission in setting North Carolina customer rates violated PURPA and the Commerce Clause.[26] 338 N.C. at 419, 422. The North Carolina Supreme Court held that the North Carolina Utilities Commission's rejection of Virginia's avoided-cost methodology did not violate the Commerce Clause. *Id.* at 422. The North Carolina Supreme Court noted: "While we recognize that inconsistent determinations of avoided costs by the [Virginia State Corporation Commission] and the [North Carolina] Commission may burden NC Power, we believe this burden is a necessary consequence of doing business in more than one state." *N. Carolina Power*, 338 N.C. at 422.

Similarly here, disparate cost allocation methodologies amongst the jurisdictions where PacifiCorp conducts business may result in burdensome accounting. But neither disparate methodologies among jurisdictions nor burdensome accounting violates the dormant Commerce Clause.

---

[26] *See North Carolina Power* discussion regarding PURPA *supra* section B(1)(a).

d.      Facial discrimination[27]

PacifiCorp argues that the Final Order's "differential treatment of out-of-state QF PPAs," which is "based on their geographic location," is "discriminatory on its face." Br. of Appellant at 36. We disagree.

First, we reject PacifiCorp's contention that the Commission's disallowance of full cost recovery of out-of-state QF PPAs was based exclusively on geography. The Commission explained that "[t]he rationale for situs allocation, as recognized in [the WCA methodology], is to insulate states from *policy decisions* made by other states." AR at 869 (emphasis added). Like Washington, Oregon and California have the discretion to calculate avoided costs in their respective jurisdictions to promote their own state's energy policy. *See Cal. Pub. Utils. Comm'n*, 133 FERC ¶ 61,059, ¶ 24. Thus, Oregon and California calculate avoided costs to further their respective state's energy policies. And the Commission's use of a situs allocation methodology is premised on Washington's underlying energy policy considerations.

Second, PacifiCorp fails to demonstrate that the Commission's disallowance of full cost recovery of out-of-state QF PPAs is facially discriminatory. As noted above, discrimination "'simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter.'" *Rocky Mountain Farmers*, 730 F.3d at 1087 (quoting *Oregon Waste Sys.*, 511 U.S. at 99). For the first time in its reply, and at oral argument, PacifiCorp argues that the Final Order "creates a preference for in-state [energy] generation to protect the economic interests of Washington customers." Reply Br. of Appellant at 13. We generally do not address

---

[27] PacifiCorp's arguments relate only to facial discrimination under the dormant Commerce Clause. It does not offer argument or authority regarding a discriminatory intent or effect.

issues raised for the first time in the reply brief. *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992). However, we address PacifiCorp's belated argument in order to resolve this dispute.

PacifiCorp argues that the Commission's refusal to allow PacifiCorp to recover its costs associated with Oregon and California QF PPAs from Washington ratepayers, and the Commission's adherence to a situs allocation methodology, is discriminatory because it protects Washington ratepayers' financial interests. PacifiCorp's argument is belied by the record. The Staff's expert, David Gomez, testified before the Commission that the Staff would advocate using the WCA methodology and situs allocation even if it resulted in higher power costs.

> Q: If QF power was acquired in Washington at prices that increased [costs], would Staff still recommend continued situs allocation?
>
> [Gomez]: Absolutely. Situs allocation of QFs is not driven by costs, but instead by principles that account properly for variances in the pricing and acquisition policies of individual jurisdictions established under PURPA, and, coincidentally, protect each jurisdiction's ratepayers from those variances. Therefore, if those policies resulted in purchases of power from QFs located in Washington that increased [costs], fairness would dictate continued situs allocation to Washington.

AR 3237 (boldface omitted). Gomez's testimony indicates that the Commission's adoption of a situs allocation methodology was not based on benefitting the economic interests of Washington ratepayers. Rather, it was based on the nondiscriminatory purpose of following policies established under PURPA, regardless of whether the situs allocation methodology increased costs to Washington ratepayers.

PacifiCorp fails to establish that the Final Order discriminates against out-of-state economic interests or affects interstate commerce. Therefore, PacifiCorp's claim that the Final Order violates the dormant Commerce Clause fails.

C.    HYPOTHETICAL CAPITAL STRUCTURE

PacifiCorp argues that the Commission's use of a hypothetical capital structure in determining PacifiCorp's customer rates is arbitrary and unsupported by substantial evidence. We disagree.

1.    Legal Principles

The Commission has broad generalized powers in making rate-setting decisions, including substantial discretion in selecting the appropriate rate-making methodology. *US W. Commc'ns* II, 134 Wn.2d at 86; *POWER*, 104 Wn.2d at 812. The Commission's discretionary decision will not be set aside absent a clear showing of abuse. *Arco Prods.*, 125 Wn.2d at 812. PacifiCorp has the burden to demonstrate that the Commission's order is invalid. *US W. Commc'ns* I, 134 Wn.2d at 56.

To set customer rates, the Commission determines an appropriate rate of return for the utility. The overall rate of return is based on the utility's debt and equity, and its respective costs of debt and equity, which requires the Commission to determine the debt-to-equity ratio, which is part of the utility's capital structure.

The Commission determines a utility's capital structure in a way that seeks to balance "debt and equity on the bases of economy and safety." *WUTC v. Puget Sound Energy, Inc.*, Dockets UG-040640/UE-040641 (consolidated), Order 06 at ¶ 27; *accord WUTC v. Puget Sound Energy, Inc.,* Dockets UE-111048/UG-111049 (consolidated), Order 08 at ¶ 35. "The economy of lower cost debt, on which [a utility] has a legal obligation to pay interest, must be balanced against the safety of higher cost common equity on which [a utility] has no legal obligation to pay a return at any particular time." Dockets UG-040640/UE-040641, Order 06 at ¶ 27. The Commission uses

"actual, pro forma, or imputed capital structures to strike the right balance and determine overall rate of return on a case-by-case basis." Dockets UG-040640/UE-040641, Order 06 at ¶ 27.

A capital structure of greater equity and less debt results in higher customer rates. *WUTC v. Puget Sound Energy, Inc.,* Dockets UE-111048/UG-111049, Order 08 at ¶ 35. On the other hand, a utility capital structure with greater debt and less equity results in lower costs to customers and a lower rate of return for the utility. Dockets UE-111048/UG-111049, Order 08 at ¶ 35. The Commission may use either actual or hypothetical capital structures to strike the right balance on a case-by-case basis. *See WUTC v. Puget Sound Energy, Inc.*, Dockets UG-040640/UE-040641, Order 06 at ¶ 27.

2.      The Commission's Use of a Hypothetical Capital Structure

PacifiCorp claims that the Commission's discussion that the hypothetical capital structure will support PacifiCorp's credit rating in the future is unsupported by substantial evidence.[28] We disagree.

PacifiCorp again challenges statements in the Final Order that are presented as factual background, not as findings or conclusions. PacifiCorp does not explain how, even if background discussions are unsupported by substantial evidence, PacifiCorp's challenge would require us to reverse the Final Order. And, even if the factual background discussion to which PacifiCorp assigns error could, in part, be interpreted as findings of fact, PacifiCorp's challenge fails.

---

[28] PacifiCorp also asserts that the Commission erroneously determined that "an equity ratio of 49.1 percent 'has proven over several years to be well-balanced in terms of safety and economy'" and "PacifiCorp's reduced cost of long-term debt was tangible evidence that [PacifiCorp] has sufficient access to low-cost capital." Br. of Appellant at 38. However, PacifiCorp does not offer argument on those points. Accordingly, we do not address its unsupported assertions. RAP 10.3(a)(6).

As noted, the Commission has substantial discretion in selecting rate-making methodology, and the Commission's findings are prima facie correct. *US W. Commc'ns* I, 134 Wn.2d at 56; RCW 80.04.430. Substantial evidence is evidence that is sufficient to persuade a fair-minded person of their truth. *City of Vancouver*, 180 Wn. App. at 347. Further, the substantial evidence standard is "highly deferential." *Arco Prods.*, 235 Wn.2d at 812. We will not reverse a discretionary decision absent an abuse of discretion.[29] *Arco Prods.*, 125 Wn.2d at 812.

The Commission's discussion that a hypothetical 49.1 percent equity component in PacifiCorp's debt-to-equity ratio would continue to maintain PacifiCorp's credit rating was supported by substantial evidence.[30] The Commission heard testimony from three expert witnesses regarding PacifiCorp's proposed capital structure. PacifiCorp presented Bruce Williams. The Staff presented Kenneth Elgin, and Packaging Corp. presented Michael Gorman. Ultimately, the Commission maintained the "currently approved" hypothetical capital structure, including an equity component of 49.1 percent, will continue to support PacifiCorp's current credit rating as

---

[29] We review the Commission's use of a hypothetical capital structure for an abuse of discretion. The Commission has substantial discretion in selecting appropriate rate-making methodology. *See US West* I, 134 Wn.2d at 57. While PacifiCorp contends that the Commission's use of a hypothetical capital structure is unsupported by substantial evidence, its argument merely explains the validity of its proposal.

[30] PacifiCorp also asserts that the "Commission's adoption of a fictitious capital structure in [the Final Order] is based on findings that are erroneous and entirely lacking in evidentiary support." Br. of Appellant at 40. To the extent that PacifiCorp asserts that the Commission's *order* lacks substantial evidence, we do not address the argument because PacifiCorp fails to assign error to the Commission's findings or offer arguments demonstrating which findings it takes issue with. RAP 10.3(a), (g), (h).

evidenced by PacifiCorp's ability to obtain capital during the pendency of the case. AR at 840-41.

PacifiCorp's argument highlights evidence supporting its argument that its credit rating would be downgraded if PacifiCorp was actually capitalized with the equity component used by the Commission. Before the Commission, Williams, PacifiCorp's expert, testified that PacifiCorp's credit rating will be downgraded if the company was actually capitalized at 49.1 percent. *See* Transcript (TR) at 260-62. But, PacifiCorp fails to support its argument that its credit rating will be downgraded if the Commission maintains the hypothetical capital structure for rate-making of 49.1 percent equity.[31]

The Commission considered the significant variation in the parties' respective capital structure recommendations, noted that PacifiCorp's actual "equity capitalization is largely the result of cash infusions from MEHC," and recited the Staff's concerns about passing the resulting higher costs of capital from MEHC's cash infusions onto ratepayers. AR at 839. The Commission weighed the evidence and adopted the capital structure that it determined appropriately balanced safety and economy. The existence of conflicting evidence and opinions does not render the Commission's determination unsupported by substantial evidence. *See Schatz*, 178 Wn. App. at 25.

---

[31] PacifiCorp also argues that Gorman offered inconsistent testimony during cross-examination. To the extent that PacifiCorp is arguing that Gorman was not a credible witness or that the Commission erred by considering Gorman's testimony, that argument fails because this court does not make credibility determinations or weigh evidence. *Darkenwald v. State Emp't Sec. Dep't*, 182 Wn. App. 157, 172, 328 P.3d 977 (2014), *aff'd,* 183 Wn.2d 237, 350 P.3d 647 (2015).

We will not substitute our judgment for that of the Commission in rate cases where the regulatory agency has substantial discretion in selecting the appropriate rate-making methodology. *US W. Commc'ns* I, 134 Wn.2d at 56. And we do not reverse a discretionary decision absent a showing that the Commission abused its discretion. *Arco Prods.*, 125 Wn.2d at 812; *see US W. Commc'ns* I, 134 Wn.2d at 56 (noting that the Commission exercises discretion in rate-making). PacifiCorp does not demonstrate that the Commission abused its discretion by continuing to use the hypothetical capital structure after considering extensive testimony and various proposals.[32]

To the extent that PacifiCorp argues that the Commission cannot use a hypothetical capital structure for rate-making purposes, that argument also fails. The use of a hypothetical capital structure is an accepted methodology. *See 2005 PacifiCorp*, Docket UE-050684, Order 04 at ¶¶ 230-33; *accord In re Application of Citizens Utils. Co. v. Idaho Pub. Utils. Comm'n*, 112 Idaho 1061, 739 P.2d 360, 363 (1987) (holding the Idaho Utilities Commission's use of a hypothetical capital structure is within its power to protect ratepayers).[33] And, Williams, PacifiCorp's expert,

---

[32] It is reasonable that, because the various parties disagreed about the best approach, the parties would submit competing evidence and proposals. And because competing evidence was presented, the Commission would have used its discretion to make complex factual determinations and select a proposal. It is precisely in this sort of circumstance that we defer to the Commission's discretion and authority. *See US W. Commc'ns* I, 134 Wn.2d at 56 (quoting *Cole*, 79 Wn.2d at 309) (holding that the Commission exercises substantial discretion in selecting the appropriate rate-making methodology, and "[t]his is especially true where, as here, the issues involve complex factual determinations peculiarly within the expertise of the commission"); *see also* RCW 80.04.430 (providing the Commission's findings are prima facie correct).

[33] *See also Gen. Tel. Co. of the Nw., Inc. v. Idaho Pub. Utils. Comm'n*, 109 Idaho 942, 712 P.2d 643, 645-46 (1986) (holding that the Utilities Commission has the discretion to use a hypothetical capital structure in setting customer rates, particularly where the utility is a wholly-owned subsidiary of a holding company). The Utility argued that the Commission erred by using a hypothetical capital structure because it improperly substituted the Commission's judgment for that of the Utility's directors. *Id.* The Idaho Supreme Court rejected that argument, holding that

testified that while hypothetical capital structures are appropriate in some cases, the capital structure should be assessed "case-by-case." TR at 224.

PacifiCorp also argues that the Commission did not "address the fact that every other state jurisdiction in which [PacifiCorp] operates uses the Company's actual capital structure for ratemaking." Br. of Appellant at 40. However, PacifiCorp does not provide authority to support the requirement that the Commission must adopt or defer to the decisions or methodologies of other state commissions. *See* RCW 80.01.040 (providing the Commission regulate rates, services, facilities, and practices of utility's providing services in Washington State).

PacifiCorp challenge to the Commission's discussion of the effect of a hypothetical capital structure on its credit rating fails.

3.      Evidence From PacifiCorp's 2010 Rate Case

PacifiCorp argues that the Commission improperly relied on evidence from a prior rate case to support the use of a hypothetical capital structure. Again, we disagree.

PacifiCorp claims that "[t]o support its reliance on past evidence, the Commission in the [Final Order] claimed that "*all* of the cost of capital evidence and advocacy in this case closely matches that presented in the earlier case." Br. of Appellant at 42 (citing AR at 842). And while PacifiCorp cites the passage from paragraphs 39-41 to explain how the Commission justified its

---

the Commission "is not telling the company to change its capital structure. Rather, the [C]omission is merely recognizing the existence of the holding company arrangement, for purposes of setting rates." *Id.* at 648. Further, "[t]he function of this commission is regulatory and not managerial. The determination of debt-equity ratios of capital is for management, but when a policy adopted by management results in the payment by subscribers of rates higher than might be required under another policy available to management, then this commission must take note." *Id.* at 649.

alleged reliance on a past case, PacifiCorp does not provide argument demonstrating that the Commission actually relied only on past evidence.

PacifiCorp cites to a recent Puget Sound Energy rate case to support its claim that the Commission erred by considering evidence from a prior case. Br. of Appellant at 43 (citing Thurston County Superior Court, Cause Nos. 13-2-01576-2 and 13-2-01582-7 (consolidated) on July 25, 2014. Docket UE 121697/UG 121705 (consolidated), Order 11 at ¶ 1). Even assuming without deciding that the Commission "relied" on evidence from a prior case, as PacifiCorp contends, PacifiCorp's authority is distinguishable. In that case, the Thurston County Superior Court reversed a Commission order because it found that the Commission lacked sufficient evidence for its decision. *Wash. Utils. & Transp. Comm'n v. Puget Sound Energy*, Dockets UE 121697/UG 121705 (consolidated), Order 11, at ¶¶ 2, 4, 5. In *Puget Sound Energy*,

> The Court determined however that the Commission, having expressed the point that "the record on the issue [of return on equity] in this case lacks the depth and breadth of data analysis, and the diversity of expert evaluation and opinion on which the Commission customarily relies in setting return on equity," should not have left the previously approved rate of return on equity in place and should instead have required the submission of additional evidence.

Dockets UE 121697/UG 121705, Order 11 at ¶ 4. Here, unlike *Puget Sound Energy*, the parties presented and the Commission considered extensive expert testimony and evidence. Therefore, *Puget Sound Energy* is unpersuasive.

As discussed above, based on the evidence presented through experts, the Commission weighed the evidence and made credibility determinations in reaching its decision to adopt a hypothetical capital structure with a 49.1 percent equity component. PacifiCorp presented Bruce Williams, the Staff presented Kenneth Elgin, and Packaging Corp. presented Michael Gorman.

The Commission found, "The record in this case demonstrates that this capital structure will continue to support PacifiCorp's current credit rating, and provide sufficient cash flows to support the financial metrics analyzed by the credit rating agencies." AR at 840-412, Order 05 ¶¶ 39, 40-42. The Commission noted a "similarity between [PacifiCorp's] evidence and advocacy in its 2010/2011 general rate case and the case here." AR at 841; s*ee* AR (Pleadings) at 638-42. But acknowledging similarities between the current case and prior cases does not support PacifiCorp's contention that the Commission relied on evidence from its prior case. Thus, PacifiCorp's claim fails.

> 4.     Rejection of PacifiCorp's Actual Capital Structure

Lastly, PacifiCorp asserts that the "Commission's rejection of PacifiCorp's actual capitalization was arbitrary and contrary to precedent," because "PacifiCorp's actual capital structure properly balances economy and safety." Br. of Appellant at 44 (boldface omitted) (some capitalization omitted). PacifiCorp also claims that the Commission's "refusal . . . to address [PacifiCorp's] chronic under-recovery of its costs in Washington" and refusal to adopt its proposal were arbitrary and capricious. Br. of Appellant at 46. We find PacifiCorp's arguments here without merit because PacifiCorp's assertion lacks meaningful argument and relevant authority.

An agency's action is arbitrary and capricious only if it is made willfully and unreasonably without regard to the attending facts or circumstances. *Attorney Gen.'s Office*, 128 Wn. App. at 824 (quoting *Hillis*, 131 Wn.2d at 383). If there is room for two opinions, any action taken after due consideration is not arbitrary and capricious even though a reviewing court may believe it to be erroneous. *Attorney Gen.'s Office*, 128 Wn. App. at 824 (quoting *Rios*, 145 Wn.2d at 501). Also, the existence of contradictory evidence or the possibility of deriving conflicting conclusions

from the evidence does not render an agency decision arbitrary and capricious. *Attorney Gen.'s Office*, 128 Wn. App. at 824.

> This examination of agency action is consistent with the APA's requirement that "[i]n reviewing matters within agency discretion, the court shall limit its function to assuring that the agency has exercised its discretion in accordance with law, and shall not itself undertake to exercise the discretion that the legislature has placed in the agency."

*Wash. Indep. Tel. Ass'n v. Wash. Utils. & Transp. Comm'n*, 148 Wn.2d 887, 904, 64 P.3d 606 (2003) (quoting RCW 34.05.574(1)).

The Commission considered capital structure proposals from PacifiCorp, the Staff, and Packaging Corp. PacifiCorp recommended that the Commission increase PacifiCorp's equity component from 49.1 percent to 52.22 percent for rate-making purposes. The Staff recommended that the Commission decrease PacifiCorp's equity component from 49.1 percent to 46 percent. Packaging Corp. recommended that the Commission maintain PacifiCorp's equity level at 49.1 percent but adjust other factors in PacifiCorp's cost of capital.

The Commission determined that the hypothetical capital structure of 49.1 percent equity component in PacifiCorp's debt-to-equity ratio was the most appropriate for PacifiCorp. The Commission rejected PacifiCorp's proposed 52.22 percent equity component as tipping the safety and economy balance too far in favor of investor interests over those of ratepayers. While PacifiCorp presented expert testimony supporting its proposal, an action is not arbitrary and capricious simply because of the possibility of contradictory evidence or conflicting conclusions. *See Attorney Gen.'s Office*, 128 Wn. App. at 824.

The Commission's order reflects careful consideration of the extensive evidence. The Commission rejected the Staff's proposal and PacifiCorp's proposal, and selected a proposal it found to be the best option based on the evidence presented. PacifiCorp fails to meet its burden to demonstrate that the Commission's hypothetical capital structure for rate-making purposes was arbitrary and capricious.

To the extent PacifiCorp argues that the Commission must determine its rates using its actual capital structure to ensure PacifiCorp's credit rating, its argument fails because PacifiCorp offers no authority to support its argument. And "[w]here no authorities are cited in support of a proposition, the court is not required to search out authorities, but may assume that counsel, after diligent search, has found none." *DeHeer v. Seattle Post-Intelligencer*, 60 Wn.2d 122, 126, 372 P.2d 193 (1962).

PacifiCorp also claims that the Commission should have adopted its actual equity capitalization to mitigate its under-recovery of its Washington costs. Again, PacifiCorp fails to support this claim with meaningful argument or authority.

PacifiCorp offers a discussion of Washington's regulatory climate and former Governor Gregoire's recommendations, presumably in support of its argument that the Commission should better address PacifiCorp's under-recovery. We decline PacifiCorp's invitation to join the discussion of "Washington's energy future" and the appropriate regulatory climate. Br. of Appellant at 45.

CONCLUSION

We hold that PacifiCorp has not demonstrated that the Commission erred in rejecting PacifiCorp's proposed revisions to the WCA methodology or by rejecting PacifiCorp's actual capital structure used for rate-making purposes. Accordingly, we affirm.

_____
Lee, J.

We concur:

_____
Bjorgen, C.J.

_____
Maxa, J.