# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| PACIFIC COAST SHREDDING, L.L.C., a Washington limited liability company, | No. 52020-6-II |
| Appellant/Cross-Respondent, | |
| v. | |
| PORT OF VANCOUVER, USA, a Washington municipal corporation, | PUBLISHED OPINION |
| Respondent/Cross-Appellant. | |

GLASGOW, J.—The Port of Vancouver USA (Port) condemned a portion of land it leased to Pacific Coast Shredding LLC (PCS) and informed PCS of its right under federal and state law to receive financial compensation for any reasonable and necessary costs that PCS incurred as a result of the taking. PCS made a number of significant modifications to its operations and requested reimbursement for each of them. The Port largely rejected the request and paid PCS only for the cost of moving some of its personal property out of the condemned area.

PCS appealed to an administrative panel, which upheld the Port's decision. PCS then appealed to the superior court, which reversed. The court ruled that the panel erred in denying additional compensation because it failed to consider which of PCS's actions were reasonable and necessary responses to the taking. The court held that the taking required PCS to do more than simply move personal property out of the condemned area in order to continue its operations. The Port did not further appeal this decision.

On remand, the administrative panel again denied additional compensation to PCS. The panel found that none of PCS's actions were reasonable and necessary and that any increased operational costs incurred as a result of the taking were minimal. PCS again appealed to the superior court. The court ruled that the panel violated its remand instructions from the initial appeal and erred in denying any additional compensation. The court determined that PCS was entitled to the cost of reconfiguring one piece of heavy equipment and increased costs of moving shred material that PCS had incurred up until it reconfigured the equipment. But PCS was not entitled to reimbursement for any other operational changes.

PCS appeals, seeking reimbursement for the cost of its full site reconfiguration. It argues that the panel's decision violated the law of the case and was unsupported by substantial evidence, contrary to law, and arbitrary and capricious. The Port also filed a notice of appeal from the superior court's decision but does not assign error to any aspect of the panel's decision.

We hold that although the panel's challenged factual findings were supported by substantial evidence, the panel erred in denying additional compensation to PCS because it misapplied the law. First, the panel was bound by the superior court remand order, which the Port did not appeal, to award some level of compensation beyond only reimbursement for moving personal property out of the condemned area. Second, although the panel's findings were supported by substantial evidence, it was a misapplication of the law and arbitrary and capricious for the panel to reject some additional compensation when the panel established that the taking required periodic relocation of shred material and, therefore, the taking impacted PCS's operations beyond simply necessitating a move of personal property out of the condemned area.

We reverse the panel's decision in part and conclude that PCS is entitled to some additional compensation for reasonable and necessary relocation of shred material, as well as reasonable and necessary reconfiguration of one piece of equipment, the conveyor. The panel's alternative findings establish that the amounts awarded by the superior court are appropriate. This matter is therefore remanded to the panel for entry of a final order awarding PCS $347,800 in expenses for reconfiguration of the conveyor and an additional $46,000 in tramming costs incurred to move shred material prior to reconfiguration, in addition to the $68,259 already paid. We otherwise affirm the panel's decision rejecting all other claims. Consistent with the superior court's order, the panel may consider any requests related to costs and fees.

## FACTS

PCS operates a scrap metal recycling operation on land leased from the Port. Prior to the taking at issue in this case, PCS bought scrap metal and collected it at the north end of the property, where it fed the metal into a shredder. The machine broke the scrap metal into smaller pieces and separated ferrous and nonferrous material. Nonferrous shred was deposited into piles, while ferrous shred was conveyed through a "'Z box,'" which filtered out impurities, to a picking station where employees checked for additional impurities. Clerk's Papers (CP) at 6. At this point, a conveyor picked up the shred and deposited it into a large, partial annulus shaped "'conveyor-stacked shred'" pile near the southern edge of the property. CP at 187. Depending on the size of this pile, PCS occasionally used front-end loaders to push some of the shred into another pile at the southwest corner of the property. Trucks entered the property from the east and then moved counterclockwise around the property, loading and unloading at various piles.

3

The Port condemned a 47,598-square foot strip of the 13-acre leasehold, left of the orange dotted line in the image below, of which 7,332 square feet was used by PCS for its operations. The condemned area overlapped with the truck traffic path and some of the area PCS used to pile shred material. The following image is a demonstrative exhibit depicting a portion of PCS's operations prior to the taking, with the dotted line depicting the boundary of the taking:



Administrative Record (AR) at 1155. The condemnation required PCS to move its truck traffic path several feet to the north of where it was previously located, which then encroached into another area where PCS would pile shred material. Around 45 times a year, this shred pile grew big enough that it would block or partially block the new truck traffic path, creating a choke point.

The Port informed PCS of its right under federal and state law to receive financial assistance to relocate or reconfigure its operations in light of the taking. A relocation specialist for

the Port, Martyn Daniel, determined that PCS was eligible for reimbursement only for the cost of moving the shred and other materials out of the condemned area. The Port accordingly paid PCS $68,259.

PCS disputed the Port's conclusion that it was entitled only to payment for moving personal property from the condemned area. PCS contended that the taking required more substantial changes to its operations to maintain the traffic path necessary for trucks to travel along the south side of the property, as well as the space necessary for piling shred. To make room for the relocation of the truck traffic path, PCS reconfigured the conveyor by turning it 90 degrees to the west and extending it 77 feet, and PCS built a new shred pad in the new conveyor-stacked shred location. The following is a demonstrative exhibit depicting a portion of PCS's operations after the taking:



AR at 1160. In addition, PCS relocated a rail spur to the west, upgraded some storm water facilities, expanded and improved employee parking, added a new picking conveyor, and made substantial changes to its office space and the property entrance. Together these changes cost over $6.1 million.

PCS sought full reimbursement for all of these changes, arguing that they were all reasonable and necessary consequences of the taking. The Port rejected the claim. PCS appealed, and the Port convened a three-person panel to consider the evidence, hear testimony, and resolve the appeal.

Neil Fitzpatrick, an operations manager at PCS, authorized the site reconfigurations. He testified about PCS's reasons for the reconfiguration, although he admitted that he did not understand the full scope of the taking until the hearing. Three engineers—Dr. Adam Aleksander, Neil Alongi, and Valerie Uskoski—testified to the safety and efficiency concerns facing PCS in terms of maintaining the truck path. In particular, Aleksander and Alongi both testified that prior to the taking, PCS maintained a truck path width of at least 20 feet. The panel received conflicting testimony and photographic evidence, however, that PCS had maintained the truck path at a minimum width of 14.9 feet. Moreover, PCS's initial construction plans for the reconfiguration that were submitted to the city provided for a 15-foot wide truck path.

The panel upheld the Port's decision not to reimburse PCS for moving shred out of the new truck traffic path or the reconfigurations it made to adjust its operations after the taking. The panel determined that the issue presented was an "all or nothing proposition"—whether PCS's full site reconfiguration was a reasonable and necessary response to the taking. CP at 17. The panel did not enter formal findings of fact, but it did note that the site remained "virtually unchanged" after the

taking except that the taking infringed on the area containing the shred pile. CP at 6. The panel recognized that, after the taking, the shred pile could occasionally spill onto the truck path and create a potential "'choke point'" in the circulation of truck traffic. CP at 6. However, the panel noted that there was evidence that the truck path was at times as narrow as 14.9 feet wide before the taking, so the choke point issue could be avoided by reducing the width of the truck path after the taking. Thus, the panel concluded that PCS's full reconfiguration was not a reasonable and necessary response to the "purported 'choke point'" resulting from the taking. CP at 20-21. The panel accordingly denied any reimbursement beyond the $68,259 already paid for relocating the shred material from the condemned area.

PCS appealed to Clark County Superior Court. The superior court ruled that the panel erred by concluding that the taking resulted only in a "potential 'choke point,'" when the parties had agreed that the choke point was an actual consequence of the taking. CP at 193. Rather than consider "'all or nothing'" whether the *entire* reconfiguration of PCS's operations was reasonable and necessary, the panel should have conducted a more detailed analysis of which aspects of the reconfiguration were reasonable and necessary consequences of the taking. CP at 193. The superior court explained: "In order to continue to operate its business, PCS was required to address the issue created by the Port's action, either by relocating portions of its facilities or by increasing its operational expenses through the movement of excess shred." CP at 193.

The superior court also noted in its summary of the underlying facts that PCS had previously maintained a minimum 20-foot traffic corridor around the shred piles. But the court did not expressly conclude that substantial evidence in the record failed to support the panel's finding that PCS had historically narrowed the truck path to 14.9 feet occasionally.

The superior court remanded for the panel to reconsider "the issue of the amount of PCS's reconfiguration expenses that were necessary and reasonably related to addressing the 'choke point' caused by the Port's condemnation of the southern portion of the leasehold property." CP at 194. Neither party appealed the superior court's decision.

On remand, the panel denied additional compensation to PCS. The panel again concluded that the full site reconfiguration was not reasonable and necessary. The panel found that the truck path before the taking was sometimes as narrow as 14.9 feet wide, specifically noting that the evidence provided by the Port was more reliable than PCS's evidence that the minimum width of the truck path had been 20 feet. The panel found that the taking required moving the truck path 8.5 feet to the north in order to maintain a 14.9-foot wide truck path, and this encroached only on the shred stack and did not impact any buildings, structures, or equipment. Even so, the panel also found that the shred stack became large enough to encroach on the new truck traffic path several times a year, and the cost of moving the excess shred out of the way would be approximately $46,000 a year. The panel noted that there was "no credible evidence that PCS ever evaluated the actual impacts of the Port's project or any [less expensive] alternatives that mitigated the alleged impact." CP at 203.

The panel concluded that none of PCS's reconfiguration costs, taken individually, were reasonable or necessary because the reasonable solution was to periodically move any excess shred to another area and do nothing else. The panel also concluded that the increased costs PCS would have incurred of about $46,000 a year by following this "'do nothing'" approach were de minimis and not reimbursable. CP at 205. The panel reasoned that it would have been far cheaper to move the shred and that the Port presented several other cheaper alternatives to a full reconfiguration,

costing from $25,000 to about $775,000. One of these alternatives was turning the conveyor 90 degrees at a cost of $347,800.

The panel emphasized that PCS apparently never engaged in a cost-benefit analysis of its reconfiguration, and so it was unreasonable to proceed with the full $6.1 million reconfiguration without exploring cheaper alternatives. The panel also rejected PCS's contention that the Port's suggested alternatives were unsafe because PCS presented no evidence regarding the safety of those alternatives.

The panel then entered a series of secondary findings specific to each action taken by PCS in case the superior court reversed the panel's conclusion that PCS was not entitled to any further reimbursement. First, it found that turning the conveyor 90 degrees was not reasonable and necessary and, even if it were, only $347,800 of the $3,129,528 claimed by PCS for accomplishing the conveyor turn was actually attributable to the taking and reimbursable.

Second, the panel found that relocating the rail spur was not reasonable and necessary because there was evidence that PCS had often used the existing rail spur to store scrap metal before the taking, so there was nothing to suggest that PCS could not continue that practice with excess shred after the taking. Again, the panel emphasized that PCS did not analyze any alternatives. The panel explained that the only plausible explanation for moving the rail spur was PCS's decision to extend the conveyor 77 feet to the west, but that extension was not related to the taking and instead was an improvement that was not eligible for reimbursement. And even if the extension and moving the spur were reasonable and necessary, the panel found that a minor (and cheaper) alternative adjustment to the spur was available to PCS.

Third, the panel concluded that PCS's remaining expenditures for the full site reconfiguration were not necessary and reasonably related to addressing the choke point. Cheaper alternative options were available, and the panel did not find PCS's expert on this matter to be credible. The panel specifically concluded that tramming costs, or costs of moving shred out of the new truck traffic path, were only $46,000 a year, and PCS's claimed increased annual operation costs of $5,426,850 were "significantly overstated." CP at 214. The panel also reasoned that reimbursement for tramming costs for the shred creating the choke point was not appropriate because PCS was only eligible for reimbursement to move personal property from the condemned area.

PCS appealed once more to the superior court, which ruled that the panel erred in denying PCS any additional compensation for its reconfiguration expenses. The superior court reasoned that the panel failed to follow the court's remand instructions because the panel continued to focus on the entire reconfiguration, rather than *consider* piecemeal each of PCS's actions.

The superior court emphasized it had already ruled in an order that was not appealed that PCS was entitled to some additional costs associated with the choke point problem, so the panel erred in denying PCS any additional compensation. The superior court explained that its prior "order noted that the taking required PCS 'to *either* (a) use machinery to "tram" materials away from the area and store these materials in additional "loader-stacked shred" piles or (b) reconfigure the conveyor . . . to deposit the "conveyor-stacked shred" pile on another portion of the leasehold property,'" rather than so near the truck path that it would regularly block the road. CP at 369 (alterations in original).

The superior court therefore ruled that in addition to the reimbursement already paid, PCS was entitled to the costs of turning the conveyor and tramming materials before the conveyor was turned, which the panel had calculated at $347,800 and $46,000, respectively. The superior court adopted those figures in its order.

PCS appeals and the Port cross-appeals, but the Port asks only that we affirm the panel's decision.

ANALYSIS

PCS argues that the panel's decision denying additional compensation contradicted the law of the case, was not supported by substantial evidence, was contrary to law, and was internally inconsistent and arbitrary and capricious. PCS assigns error to the panel's finding that PCS previously operated with a 14.9-foot wide truck path, its rejection of PCS's arguments pertaining to safety, and its determination that PCS was entitled to compensation only for a one-time move of personal property from the condemned area.

With regard to the panel's finding on the 14.9-foot truck path, the law of the case doctrine did not apply to this factual finding and it was supported by substantial evidence. The panel's findings related to PCS's safety concerns were also supported by substantial evidence. However, we hold that the panel erred in denying any additional compensation to PCS. The superior court's order bound the panel to compensate PCS for additional reasonable and necessary costs caused by the taking. Having recognized that the taking forced PCS to do more than just the one-time move of personal property out of the condemnation area, the panel was required under the law to award some amount of additional compensation. The panel's refusal to order any additional

compensation violated the law of the case, was a misapplication of the law, and was arbitrary and capricious.

A.    Background on Relocation Law

PCS's claim for compensation arose under Washington's real property acquisition policy act (chapter 8.26 RCW) and its corresponding administrative regulations (chapter 468-100 WAC), as well as the federal Uniform Relocation Assistance and Real Property Policies Act of 1970 (42 U.S.C. §§ 4601-4655) and its corresponding regulations (49 C.F.R. § 24.1-.306).[1] The Washington State Department of Transportation *Right of Way Manual* (Aug. 2012) (M 26-01.08) (WSDOT Manual)[2] also provides guidance to agencies implementing these laws, including the Port. The Port acknowledges that it relies on the WSDOT Manual. Both the federal and state statutes indicate that their primary purpose is to minimize the hardship of displacement for individuals and businesses affected by public projects by providing uniform procedures for providing relocation assistance. 42 U.S.C. § 4621(b); RCW 8.26.010(1)(a).

RCW 8.26.035(1) provides in relevant part that when an agency project will result in the displacement of a business, the agency shall pay the displaced business the (a) actual reasonable expenses in moving the business *or other personal property*; (b) actual losses of tangible personal property as a result of moving the business, not to exceed an amount equal to the reasonable expenses that would have been required to relocate the property; (c) actual reasonable expenses in searching for a replacement business; and (d) "[a]ctual reasonable expenses necessary to

---

[1] The federal statutes and regulations contain substantially the same language as the state statutes and regulations.

[2] https://www.wsdot.wa.gov/publications/manuals/fulltext/M26-01/M26-01.08Complete.pdf [https://perma.cc/5NDY-8VK5].

reestablish a displaced farm, nonprofit organization, or small business at its new site." WAC 468-100-301(1)(a) explains that a displaced business is entitled to all "actual moving and related expenses" that the displacing agency determines to be "reasonable and necessary."

A displacement may be characterized as "[p]ersonal property only," where the agency action forces the business to relocate personal property but does not necessitate the relocation of the entire business. WAC 468-100-301(5) (bold type omitted); WSDOT Manual § 12-9.1, at 12-110. The version of the WSDOT Manual in effect at the time of this condemnation explained that the movement of personal property that is located within the condemned or acquired area is reimbursable. *Id.* But a business can also receive reimbursement for expenses where personal property must be moved because the agency's acquisition requires the business to otherwise move personal property from real property that is located outside the condemned or acquired area. *See id.* ("Business . . . operations that must incur reestablishment expenses to facilitate the continuous operation of their business on the subject property should be relocated under the provisions of Section 12-7."); WSDOT Manual § 12-7.1, at 12-73 ("Moving of personal property when the acquisition of real property used for nonresidential use causes the displaced occupant to vacate . . . . other real property not acquired.").

Moreover, WAC 468-100-301 does not limit moving expenses for personal property to instances where the personal property is moved from the condemned or acquired area. WAC 468-100-301(5). The regulations provide:

> Eligible expenses for a person who is required to move personal property from real property but is not required to move from a . . . business . . . include . . .
>     . . . .
> [t]ransportation of the displaced . . . personal property . . . [and]
>     . . . .

> [d]isconnecting, dismantling, removing, reassembling, and reinstalling relocated . . . personal property. For businesses, . . . this includes machinery [and] equipment[,] . . . it also includes modifications to the personal property, including those mandated by federal, state or local law, code or ordinance, necessary to adapt it to the replacement structure, the replacement site, or the utilities at the replacement site, and modifications necessary to adapt the utilities at the replacement site to the personal property.

WAC 468-100-301(5), (7)(a), (c).

Storage expenses not to exceed 12 months and "[o]ther moving-related expenses that are not . . . ineligible under subsection (8) . . . as the agency determines to be reasonable and necessary" are also eligible for reimbursement. WAC 468-100-301(7)(d), (g). Certain increased operating expenses incurred as a result of the acquisition, such as personal or real property taxes or insurance premiums, are recoverable up to $50,000 for the first two years, but otherwise increased operating expenses are not eligible. WAC 468-100-301(7), (8); WAC 468-100-306(1)(f).

In sum, eligible expenses include the costs of moving personal property, reassembling and reinstalling machinery and equipment, and making modifications necessary for adapting machinery and equipment as a result of the agency's acquisition. Eligible expenses in this category also include storage expenses up to 12 months and can include some increased operating expenses up to 2 years and up to $50,000.

Neither the statute nor any relevant regulation defines "reasonable and necessary." The WSDOT Manual explained that "reasonable means the costs are typical in the geographic area in which the displacement occurred for the type of goods or services being purchased. Necessary means that such goods or services are needed to carry out the reestablishment of [the] business." § 12-7.2.3, at 12-85. "[T]he test is one of necessity, i.e., is the expense necessary to reestablish the displaced business[?]" *Id.*

The WSDOT Manual also provided:

It is important to remember that [relocation] expenses should be necessary to reestablish the present operation, not to improve it . . . . Displacement provides an excellent opportunity for an operation to do all those things itself, but they should not be accomplished with public funds. In the situation where a displaced business selects a larger replacement site or a betterment, these tests allow the specialist to set a reasonable threshold for reimbursement based on the size or quality of the displacement site.

*Id.*

B.        Standard of Review and Burden to Show Invalidity of Agency Action

The Administrative Procedure Act, chapter 34.05 RCW, governs appellate review of state and local agency decisions. *Utter v. Dep't of Soc. & Health Servs.*, 140 Wn. App. 293, 299, 165 P.3d 399 (2007). "On appeal from the superior court, we sit in the same position as the superior court and review the agency's order based on the administrative record rather than the superior court's decision." *B&R Sales, Inc. v. Dep't of Labor & Indus.*, 186 Wn. App. 367, 374, 344 P.3d 741 (2015). Upon review, we generally "treat any findings of fact or conclusions of law the superior court made as surplusage." *Morawek v. City of Bonney Lake*, 184 Wn. App. 487, 491, 337 P.3d 1097 (2014).

The party asserting the invalidity of an agency's decision has the burden of demonstrating invalidity. RCW 34.05.570(1)(a); *PacifiCorp v. Wash. Utils. & Transp. Comm'n*, 194 Wn. App. 571, 586, 376 P.3d 389 (2016). RCW 34.05.570(3) sets out nine grounds for invalidating an agency action. PCS's challenge implicates three of those grounds. PCS argues that the panel misapplied the law, the panel's factual findings were not supported by substantial evidence, and the panel's decision was arbitrary and capricious. RCW 34.05.570(3)(d), (e), (i).

We review the panel's factual findings for substantial evidence, asking whether the record contains evidence sufficient to convince a rational, fair-minded person that the finding is true. *B&R Sales*, 186 Wn. App. at 375. An agency's determination of actual costs under RCW 8.26.035 is one of fact that we review for substantial evidence. *Cedar River Water & Sewer Dist. v. King County*, 178 Wn.2d 763, 797, 315 P.3d 1065 (2013). "We do not reweigh evidence or judge witness credibility" but instead defer to the agency's broad discretion in weighing expert testimony. *PacifiCorp*, 194 Wn. App. at 588-89.

We review an agency's legal conclusions de novo, but give substantial weight to its interpretation of the law when subjects fall within its area of expertise. *B&R Sales*, 186 Wn. App. at 375. In addition, a mixed question of law and fact requires the application of legal precepts to factual circumstances. *Tapper v. Emp't Sec. Dep't*, 122 Wn.2d 397, 402, 858 P.2d 494 (1993). For example, determining whether particular facts meet a legal definition of a term like "misconduct" is a mixed question of law and fact. *Id.* "Analytically, resolving a mixed question of law and fact requires establishing the relevant facts, determining the applicable law, and then applying that law to the facts." *Id.* at 403. We are not free to substitute our judgment for that of the agency as to the facts. *Id.* "[T]he factual findings of the agency are entitled to the same level of deference which would be accorded under any other circumstance." *Id.* "The process of applying the law to the facts, however, is a question of law and is subject to de novo review." *Id.*

"An agency's action is arbitrary and capricious only if it 'is willful and unreasoning and taken without regard to the attending facts or circumstances.'" *PacifiCorp*, 194 Wn. App. at 587 (internal quotation marks omitted) (quoting *Att'y Gen.'s Office v. Wash. Utils. & Transp. Comm'n*, 128 Wn. App. 818, 824, 116 P.3d 1064 (2005)). "'Where there is room for two opinions,

an action taken after due consideration is not arbitrary and capricious even though a reviewing court may believe it to be erroneous.'" *Id.* (internal quotation marks omitted) (quoting *Att'y Gen.'s Office*, 128 Wn. App. at 824). "'Neither the existence of contradictory evidence nor the possibility of deriving conflicting conclusions from the evidence renders an agency decision arbitrary and capricious.'" *Id.* (quoting *Att'y Gen.'s Office*, 128 Wn. App. at 824).

C.      Historical Width of the Truck Path

PCS argues that the panel's determination that PCS maintained only a minimum 14.9-foot wide traffic path before the taking was not supported by substantial evidence. PCS also contends that we are bound by the superior court's determination in its first decision that PCS instead required a 20-foot wide traffic path because that decision was not appealed. We disagree.

The superior court's reference to a 20-foot wide path was a factual statement that did not bind the panel on remand under the law of the case. The law of the case doctrine most commonly "'stands for the proposition that once there is an appellate holding *enunciating a principle of law*, that holding will be followed in subsequent stages of the same litigation.'" *State v. Johnson*, 188 Wn.2d 742, 755, 399 P.3d 507 (2017) (emphasis added) (quoting *Roberson v. Perez*, 156 Wn.2d 33, 41, 123 P.3d 844 (2005)). The doctrine does not apply to factual findings. *Karanjah v. Dep't of Soc. & Health Servs.*, 199 Wn. App. 903, 916, 401 P.3d 381 (2017).

Moreover, a superior court acting in its limited appellate capacity may review whether substantial evidence supports a finding of fact, but it generally may not decide disputed factual issues. *See* RCW 34.05.570(3); *Herman v. Shorelines Hr'gs Bd.*, 149 Wn. App. 444, 455, 204 P.3d 928 (2009). Findings of fact made by a superior court acting in its appellate capacity are surplusage. *Morawek*, 184 Wn. App. at 491. The aspects of the superior court's order that were

statements of fact were not binding on the panel, nor are they binding on this court even though the superior court's first decision was not appealed.

The superior court's reference to the 20-foot wide path appeared in its statement of the case, and the court did not make any legal rulings with respect to this issue or state that the panel's finding of a 14.9-foot wide path was unsupported by substantial evidence. Absent an appellate decision based on a lack of substantial evidence, the panel was not constrained on remand from determining, as a factual matter, that the historical minimum width of the truck path was only 14.9 feet.

PCS submitted an aerial photograph from before the taking that showed the truck path was 14.9 feet wide at its narrowest point. Daniel, the Port's expert, testified that by using photographic evidence and consulting with the project surveyor he was able to determine that the narrowest point along the truck path before the taking occurred was 14.9 feet wide. Daniel also pointed out that standard highway lanes are 10 to 12 feet wide. Another expert similarly testified that the narrowest point along the path after the taking was about 15 feet wide, and this was consistent with the width of that part of the path before the taking. In addition, PCS's initial construction plans for the reconfiguration submitted to the city provided for a 15-foot wide truck path, which suggested that PCS did not think that a path of that width was unworkable.

PCS contends that this evidence was not reliable because Daniel's testimony was based on an informal survey that was intended only for illustrative purposes and Daniel was not an engineer or safety expert. PCS also contends that because some of its trucks are 14.3 feet wide, a 14.9-foot wide path would be untenable. PCS argues that its construction plans submitted to the city were

only preliminary, not final, and that Uskoski testified that the 15-foot wide path denoted in the plans did not necessarily define the actual truck path.

PCS argues instead that the truck path was at least 20 feet wide before the taking, pointing to Aleksander's and Alongi's testimonies. Aleksander testified that 20 feet was the minimum historical width and Alongi testified that the width of the traffic path typically fluctuated between 28 and 34 feet. Aleksander also opined that 28 feet was the minimum width for a safe path.

But the panel specifically found that Alongi's testimony was not credible, and that the Port's evidence establishing a 14.9-foot wide path was more reliable than PCS's evidence of a 20-foot wide path. Although Daniel admitted that some of PCS's loaders are too wide for a 14.9-foot wide path, he explained that those loaders could simply take a different path to reach their maintenance building. And even if Daniel himself is not a surveyor or engineer, he confirmed his measurements and conclusions regarding the 14.9-foot wide path with the project surveyor.

Multiple witnesses testified that the minimum width of the truck path was 14.9 feet and this testimony was supported by the evidence, even though there was also conflicting testimony in the record. The panel had considerable discretion to weigh the competing testimony and evidence, and we are not permitted on appeal to reweigh the evidence and come to a different conclusion where there is substantial evidence supporting the panel's findings. *PacifiCorp*, 194 Wn. App. at 588-89. We accordingly hold that, based on testimony from Daniel and other witnesses, the aerial photograph, and PCS's construction plans submitted to the city, there was substantial evidence to support a finding that 14.9 feet was the minimum width of the truck path before the taking occurred.

D.      Safety as a Basis for Reconfiguring the Conveyor

PCS also argues the panel erred by not considering safety in its determination that the full site reconfiguration was not reasonable and necessary. We disagree.

To support its argument that the panel did not factor safety into its decision, PCS points to testimony on the need to change the Z box and dual picking station to accommodate safe access to the shredder, to move the conveyor and rail spur for safe access across the site, and to reconfigure the entire operation to maintain a safe operating corridor through the site. PCS also argues that the panel's finding of a 14.9-foot wide traffic path ignored safety considerations because Aleksander testified that such a path would negatively impact safety and visibility.

Although Fitzpatrick mentioned safety as a concern for the reconfiguration, the panel specifically noted that Fitzpatrick did not understand the scope or impact of the Port's taking when he decided that the reconfiguration was necessary. The testimony PCS cites suggests that the necessity for making changes to the Z box and dual picking station was more related to considerations of cost and efficiency rather than safety, these changes resulted from the decision to rotate the conveyor, and they were not directly linked to safety concerns related to the underlying taking.

Most of the other testimony PCS cites did not specifically mention safety as a concern and, although Alongi stated that a safe operating corridor was an important concern for the reconfiguration, the panel specifically found that Alongi's testimony was not credible. Although Aleksander also testified about the safety concerns regarding a 14.9-foot wide traffic path, as discussed above, there was substantial evidence that such a path was viable and had been used by

20

PCS in the past, and Daniel testified that he did not see any safety issues with a 14.9-foot wide path.

The record does not support PCS's claim that the panel completely ignored safety. Rather, the panel did not find credible PCS's conclusory claim that the Port's suggested alternatives were unsafe because PCS did not present evidence regarding the safety of those alternatives. Although PCS presented some testimony regarding the safety concerns it claims motivated the site reconfiguration, we do not reweigh evidence that the panel found unpersuasive, and the panel had considerable discretion to judge the credibility of that testimony. *PacifiCorp*, 194 Wn. App. at 588-89.

PCS argues that it was the Port's burden to show that its proposed alternatives were safe, not PCS's burden to show they were unsafe, but PCS does not cite to any authority to support this contention and it is PCS's burden on appeal to show the panel's decision was improper. RCW 34.05.570(1)(a). The panel determined there was not enough evidence to suggest legitimate safety concerns that would necessitate a complete reconfiguration of the site, and PCS has not met its burden on appeal to show that this finding was unsupported by substantial evidence or otherwise legally unsound.

E.      The Panel's Denial of Additional Compensation

1.      Law of the case

PCS argues that the superior court's order bound the panel to award PCS additional compensation because the superior court determined that the taking forced PCS to either reconfigure its operations or incur greater expenses to tram excess shred to another area of the property, either of which would elevate the required compensation above a mere one-time payment

21

for moving personal property out of the condemned area. We agree that the superior court determined that PCS was entitled to some amount of compensation beyond the one-time payment to move personal property out of the condemned area, and this portion of the ruling was binding on the panel on remand.

A legal decision of an appellate court establishes the law of the case and must be followed on remand. *Lodis v. Corbis Holdings, Inc.*, 192 Wn. App. 30, 58, 366 P.3d 1246 (2015). This rule "'forbids, among other things, a lower court from relitigating issues that were decided by a higher court, whether explicitly or by reasonable implication, at an earlier stage of the same case.'" *Id.* at 56 (internal quotation marks omitted) (quoting *Mun. of San Juan v. Rullan*, 318 F.3d 26, 29 (1st Cir. 2003)). The trial court "may exercise discretion where an appellate court directs it to 'consider' an issue," provided it adheres to the appellate court's instructions. *Marriage of McCausland*, 129 Wn. App. 390, 399, 118 P.3d 944 (2005) (quoting *State ex. rel. Smith v. Superior Court*, 71 Wash. 354, 357, 128 P. 648 (1912)), *rev'd on other grounds*, 159 Wn.2d 607, 152 P.3d 1013 (2007). But the trial court must adhere to the appellate court's instructions and cannot ignore specific holdings and directions on remand. *Bank of Am., N.A. v. Owens*, 177 Wn. App. 181, 189, 311 P.3d 594 (2013).

Because the superior court here was acting in its appellate capacity, its legal rulings were binding on the panel. The superior court ruled that the panel erred in taking an "'all or nothing'" approach rather than considering whether PCS's individual actions were reasonable and necessary. CP at 193. Applying the law to the facts, the superior court concluded that PCS was entitled to more than compensation for just the one-time move of personal property. It was entitled to whatever costs were reasonable and necessary to address the ongoing choke point problem that

would occur about 45 times a year when the shred pile reached capacity. This ruling was binding on the panel. The panel was bound to recognize *some* ongoing impact of the taking beyond the one-time move of personal property out of the condemned area.

The panel's ruling on remand improperly ignored the superior court's command, and instead determined that none of PCS's costs were reasonable and necessary costs expended as a result of the taking. This was error.

2.     Determination of reasonable and necessary costs

PCS argues that the panel's denial of any further compensation was a misapplication of the law and arbitrary and capricious. We agree that the panel erred in denying PCS some additional compensation, but reject PCS's claim that it is entitled to the cost of the entire site reconfiguration.

PCS points to the panel's conclusion that "do nothing" was the reasonable alternative, where it was undisputed that PCS would have to do something about the taking's displacement of excess shred storage. CP at 204. The panel understood that PCS would have to do *something* about the excess shred, but it concluded that PCS could simply move the shred to other areas on the site whenever the shred pile reached a volume that would block the truck path. By "do nothing," the panel appears to have meant that no permanent reconfiguration was necessary, not that PCS could literally do nothing whenever the shred pile overflowed. *See* CP at 204.

The panel concluded that the need to move the excess shred "equates to approximately $46,000 per year in increased operating costs for PCS if they had *done nothing except* move the shred more often with front-end loaders." CP at 204-05 (emphasis added). Daniel testified that the loss of shred pile capacity resulting from the taking would result in an increased annual operating cost to PCS of $46,000 if PCS made no other changes to its operation. The Port and its expert

therefore agreed with PCS that at least this annual cost would result from the taking if PCS did nothing to reconfigure its machinery.

But having recognized that PCS would at least have to incur this additional expense as a result of the taking if it did not reconfigure its machinery, the panel did not conclude that some action to avoid this ongoing expense was reasonable and necessary. This approach ignored the regulations and the WSDOT Manual, which both explain that PCS was entitled to additional reimbursement in these circumstances. *See* WAC 468-100-301(5), (7).

The relevant regulations allow reimbursement for the costs of moving personal property, reassembling and reinstalling machinery and equipment, and making modifications necessary for adapting machinery and equipment as a result of the agency's acquisition. WAC 468-100-301(7)(a), (c). Eligible expenses in this category also include storage expenses up to 12 months and can include some increased operating expenses up to 2 years and up to $50,000. *Id.*; WAC 468-100-306(1)(f). Thus, even where a business does not need to entirely relocate, it is entitled to reimbursement for moving personal property that is displaced by the taking (i.e., the excess shred and the reconfiguration of equipment that must be adjusted as a result of the taking). WAC 468-100-301(5). This is true even if the business must move personal property only and not the entire business.

It was a misapplication of these regulations for the panel to deny PCS *any* additional compensation beyond moving personal property out of the condemnation area. The panel recognized that the taking created an occasional choke point that PCS would have to address whenever the shred pile reached capacity, and yet it did not award any compensation for the

24

reasonable and necessary cost of doing so. This decision misapplied the law and was arbitrary and capricious in that it ignored the ongoing cost to PCS that resulted from the taking.

Eligible expenses for a move of personal property include the reasonable and necessary costs of reassembling and reinstalling machinery and equipment and making modifications necessary for adapting machinery and equipment as a result of the agency's acquisition. WAC 468-100-301(7)(c). In PCS's case, such expenses included the cost of making necessary modifications to adapt its operations to address the choke point issue. And as discussed above, the superior court concluded, as a matter of law, that an award only for the cost of moving personal property out of the condemned area was insufficient because it did not adequately address the choke point issue that both parties agreed existed, and the Port did not appeal that ruling.

Thus, PCS was entitled to compensation for the cost of moving excess shred for so long as it was necessary and for the reasonable cost of reconfiguration of PCS's equipment to avoid that ongoing cost. This does not mean that PCS was entitled to *all* of its expenses associated with a full site reconfiguration, but the panel did not point to anything in the statute, the regulations, or the WSDOT Manual that authorized it to reject reasonable and necessary expenses simply because it considered them to be de minimis. As the superior court noted in the initial appeal, it was wrong for the panel to consider PCS's compensation as an all-or-nothing proposition. The statutory and regulatory framework clearly provides that there is an obligation to compensate for reasonable and necessary expenses to move personal property and reconfigure equipment, even where the business also must absorb the cost of additional, noncompensable improvements or modifications that are not necessitated by the government action. WSDOT Manual § 12-7.2.3, at 12-85.

PCS made numerous improvements and alterations to its site operations, but the fact that most of those actions were not necessitated by the taking does not preclude PCS from being entitled to compensation for the portion that *would have been* a reasonable and necessary response. In other words, just because PCS did not take the route determined by the panel to be reasonable and necessary does not mean that it is not entitled to any compensation. The law does not require PCS to do only the bare minimum in response to the taking; it simply provides that public funding is only available up to the amount that was both reasonable and necessary. *See id.*

The panel determined that the taking caused increased operating costs of moving the excess shred whenever the pile reached capacity, which it calculated as $46,000 a year based on the testimony of Daniel, the Port's expert. Daniel and another Port expert identified turning the conveyor as one reasonable and necessary option to eliminate the $46,000 a year expense. The panel also determined that turning the conveyor was one of the options available, and the cost of this option was $347,800. Daniel testified that PCS would be entitled to reimbursement for modifying the conveyor.

Although the Port, in its briefing, challenges the adequacy of PCS's evidence supporting its claims for reimbursement, the Port did not appeal or assign error to any portion of the panel's second decision, and it did not assign error to any of the panel's secondary findings, including the finding as to the cost of turning the conveyor. PCS was entitled to these moving and machinery reconfiguration expenses necessary to avoid the ongoing cost and to cover the cost of moving the shred until the alterations were complete. We adopt the panel's calculation of the cost to turn the conveyor and the cost of tramming excess shred before the conveyor could be turned: $347,800 and $46,000.

Otherwise, we find no other error in the panel's decision rejecting the remainder of PCS's claimed expenses. There is substantial evidence in the record supporting the panel's conclusion that the costs incurred by PCS in relocating the rail spur, upgrading storm water facilities, expanding and improving employee parking, adding a new picking conveyor, and making substantial changes to its office space and the property entrance were not reasonable and necessary responses to the taking. These changes were too attenuated from the underlying choke point issue created by the taking to be reimbursable. The panel's decision not to reimburse PCS for these costs was neither arbitrary and capricious nor contrary to law.

## CONCLUSION

The panel's decision denying any additional compensation violated the law of the case by ignoring the superior court's remand order, misapplied the applicable regulations, and was arbitrary and capricious because the panel recognized that the taking created a choke point that would result in increased operating expenses for PCS. The statutory and regulatory framework entitles PCS to some level of additional compensation.

We therefore affirm the panel's decision in part and reverse in part. We conclude that some additional compensation is due to PCS for reasonable and necessary relocation of shred material, as well as the reasonable and necessary reconfiguration of the conveyor. The panel's alternative findings establish that the amounts awarded by the superior court are appropriate. Thus, this matter is remanded to the panel for entry of a final order awarding PCS $347,800 in expenses for reconfiguration of the conveyor and an additional $46,000 in tramming costs incurred prior to reconfiguration, in addition to the $68,259 already paid. And consistent with the superior court's order, the panel may consider any requests related to costs and fees.

Glasgow, J.

We concur:

Lee, C.J.

Cruser, J.